# 24-60240

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

SIRIUS SOLUTIONS, L.L.L.P., SIRIUS SOLUTIONS GP, L.LC., TAX MATTERS PARTNER,

Petitioners-Appellants

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

## ON APPEAL FROM THE DECISION OF THE UNITED STATES TAX COURT

## BRIEF FOR THE APPELLEE

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

ELLEN PAGE DELSOLE                (202) 514-8128
PAUL A. ALLULIS                   (202) 514-5880
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for the Commissioner of Internal Revenue believe that oral argument would be helpful to the Court in this matter which presents novel and complex issues of interpretation of the Internal Revenue Code.

# TABLE OF CONTENTS

**Page**

Statement regarding oral argument...........................................................i

Table of contents.........................................................................................ii

Table of authorities ................................................................................... v

Glossary ................................................................................................... xiv

Statement of jurisdiction......................................................................... 1

Statement of the issue............................................................................. 2

Statement of the case .............................................................................. 4

    A.    Relevant facts.................................................................... 4

        1.    Organization of Sirius and Sirius GP ........................ 4

        2.    Sirius's business and the activities of the individual partners ..................................................... 7

        3.    Sirius's federal income-tax reporting........................ 9

        4.    The examination and adjustments ............................ 9

    B.    Proceedings in the Tax Court ......................................... 10

Summary of argument ............................................................................ 12

Argument:

    The Tax Court correctly determined that the individual partners of Sirius were not limited partners for purposes of I.R.C. §1402(a)(13)........................................................... 18

        Standard of review ............................................................ 18

    A.    Social Security and self-employed individuals .................... 18

    B.    Fundamental principles of federal taxation dictate the approach taken by the Tax Court......................................... 24

**Page**

    1.    Federal—not state—law controls interpretation of a federal tax statute......................................................24

    2.    Federal tax law is concerned with economic realities; labels do not control ......................................31

    3.    Federal tax law should be uniform nationwide...........33

C.    The ordinary meaning of "limited partner" in 1977 was a partner whose distributive share was basically of an investment nature.................................................................36

    1.    Historically a limited partner did not participate in the activities of the partnership .............................37

    2.    The statutory context confirms this reading ..............48

    3.    The legislative history confirms this interpretation ...51

D.    Sirius's and *amici*'s remaining arguments lack merit .........53

    1.    No negative inference can be drawn from I.R.C. § 1402(a)(10).................................................................53

    2.    The Tax Court's approach does not render the "guaranteed payments" clause surplusage..................56

    3.    IRS and Social Security Administration publications do not contradict the government's position here.................................................................57

    4.    Subsequent legislative proposals do not alter the plain meaning of § 1402(a)(13) when it was enacted........................................................................63

    5.    The 1997 Congressional moratorium does not undermine the government's position ........................65

**Page**

Conclusion ................................................................. 66

Certificate of service ................................................. 67

Certificate of compliance ......................................... 68

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*In re Adelphia Comms. Corp.,*
376 B.R. 87 (Bankr. S.D.N.Y. 2007) ...................................... 47

*Air Power, Inc. v. United States,*
741 F.2d 53 (4th Cir. 1984) .................................................. 25

*Ames v. Downing,*
1 Bradf. 321 (N.Y. Sur. 1850) .............................................. 38

*Bergerson v. Life Ins. Corp. of Am.,*
170 F. Supp. 150 (D. Utah 1958), *modified on
other grounds,*
265 F.2d 227 (10th Cir. 1959) .............................................. 42

*Bittner v. United States,*
598 U.S. 85 (2023) ................................................................ 58

*Boulware v. United States,*
552 U.S. 421 (2008) .............................................................. 31

*Britt v. United States,*
431 F.2d 227 (5th Cir. 1970) ................................................ 29

*Burke-Waggoner Oil Ass'n v. Hopkins,*
269 U.S. 110 (1925) ..........................................................28-29

*Burnet v. Harmel,*
287 U.S. 103 (1932) ............................................ 24, 30, 33, 35

*C.M. Thibodaux Co. v. United States,*
915 F.2d 992 (5th Cir. 1990) ................................................ 33

*California v. Buzard,*
382 U.S. 386 (1966) .............................................................. 26

*Cascabel Cattle Co., L.L.C. v. United States,*
955 F.3d 445 (5th Cir. 2020) ................................................ 49

*Commissioner v. Culbertson,*
337 U.S. 733 (1949) .............................................................. 29

*Commissioner v. Fortney Oil Co.,*
125 F.2d 995 (6th Cir. 1942) ................................................ 29

*Commissioner v. Tower,*
327 U.S. 280 (1946) .............................................................. 29

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,*
447 U.S. 102 (1980) .............................................................. 63

**Cases (cont.):**                                                    **Page(s)**

*Delaney v. Fid. Lease Ltd.,*
    526 S.W.2d 543 (Tex. 1975) .................................. 42
*Dolan v. U.S. Postal Serv.,*
    546 U.S. 481 (2006) ........................................ 49
*Donroy Ltd. v. United States,*
    196 F. Supp. 54 (N.D. Cal. 1961) .......................... 42
*Ellsasser v. Comm'r,*
    61 T.C. 241 (1973) ......................................... 21
*Executive Hotel Assocs. v. Elm Hotel Corp.,*
    245 N.Y.S.2d 929 (Civ. Ct. 1964) .......................... 42
*Foxfield Villa Assocs., LLC v. Robben,*
    967 F.3d 1082 (10th Cir. 2020) ............................ 47
*Gerstenbluth v. Credit Suisse Secs. (USA) LLC,*
    728 F.3d 139 (2d Cir. 2013) ............................... 59
*Goodman v. Epstein,*
    582 F.2d 388 (7th Cir. 1978) .............................. 46
*Great Lakes Chem. Corp. v. Monsanto Co.,*
    96 F. Supp. 2d 376 (D. Del. 2000) ......................... 47
*Greenspan v. Shalala,*
    38 F.2d 232 (5th Cir. 1994) ............................... 62
*Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006) ....................................... 54
*Harper v. Del. Valley Broadcasters, Inc.,*
    743 F. Supp. 1076 (D. Del. 1990) .......................... 47
*Heiner v. Mellon,*
    304 U.S. 271 (1938) ..................................... 29-31
*Hogg v. Ellis,*
    8 How. Pr. 473 (N.Y. 1853) ................................ 42
*Holzman v. Escamilla,*
    86 Cal. App. 2d 858 (1948) ................................ 42
*Hough v. Commissioner*
    162 F.3d 1151, 82 A.F.T.R.2d 98-5263 (3d Cir. 1998) ........ 48
*Kovac v. Wray,*
    109 F.4th 331 (5th Cir. 2024) ............................. 18
*Kraatz & Craig Surveying, Inc. v. Commissioner,*
    134 T.C. 167 (2010) ....................................... 26

**Cases (cont.):** **Page(s)**

*Laney v. Commissioner,*
674 F.2d 342 (5th Cir. 1982) .......................... 45

*Lee v. Navarro Sav. Ass'n,*
597 F.2d 421 (5th Cir. 1979) ............................ 46

*Lehman v. United States,*
448 F.2d 1318 (5th Cir. 1971) .......................... 27

*Lichtyger v. Franchard Corp.,*
18 N.Y.2d 528 (1966) ....................................... 41

*Life Care Centers of Am., Inc. v. Charles Town
Assocs. Ltd. P'ship,*
79 F.3d 496 (6th Cir. 1996) .............................. 47

*Lyeth v. Hoey,*
305 U.S. 188 (1938) ............................... 25, 33-35

*Lynn v. Cohen,*
359 F. Supp. 565 (S.D.N.Y. 1973) .................... 41

*Maines v. Commissioner,*
144 T.C. 123 (2015) ........................................ 26

*Marin TV Servs. Partners, Ltd. v. FCC,*
993 F.2d 261 (D.C. Cir. 1993) .......................... 47

*Marlin Broad. of Cent. Fla., Inc. v. FCC,*
952 F.2d 507 (D.C. Cir. 1992) .......................... 47

*Mayo Found. for Med. Educ. & Rsch. v. United States,*
562 U.S. 44 (2011) ........................................... 18

*Mejia v. Barr,*
952 F.3d 255 (5th Cir. 2020) ........................... 37

*Moore v. United States,*
144 S. Ct. 1680 (2024) .................................... 29

*Moreno Rios v. United States,*
256 F.2d 68 (1st Cir. 1958) .............................. 54

*Morgan v. Commissioner,*
309 U.S. 78 (1940) .................................. *passim*

*Mount Vernon Sav. & Loan Ass'n v. Partridge Assocs.,*
679 F. Supp. 522 (D. Md. 1987) ....................... 58

*National Fed. of Ind. Bus. v. Sebelius,*
567 U.S. 519 (2012) ........................................ 33

**Cases (cont.):**                                                           **Page(s)**

*O'gilvie v. United States,*
519 U.S. 79 (1996) .................................................................. 63

*Pension Ben. Guar. Corp. v. LTC Corp.,*
496 U.S. 633 (1990) .............................................................. 64

*Perrin v. United States,*
444 U.S. 37 (1979) ................................................................ 36

*PPL Corp. v. Commissioner,*
569 U.S. 329 (2013) .......................................................... 31-32

*Red Lion Broad. Co. v. FCC,*
395 U.S. 367 (1969) .............................................................. 64

*Rusello v. United States,*
464 U.S. 16 (1983) ................................................................ 54

*SEC v. Arcturus Corp.,*
928 F.3d 400 (5th Cir. 2019) ................................................ 46

*Second Carey Tr. v. Helvering,*
126 F.2d 526 (D.C. Cir. 1942) ............................................. 29

*Skolny v. Richter,*
124 N.Y.S. 152 (App. Div. 1910) ..................................... 39-40

*Soc. Sec. Bd. v. Nierotko,*
327 U.S. 358 (1946) ...................................................... 18, 49-50

*Soroban Cap. Partners, LP v. Commissioner,*
No. 16217-22, 2023 WL 8235164
(T.C. Nov. 28, 2023)..................................................... *passim*

*South Carolina v. Regan,*
465 U.S. 367 (1984) .............................................................. 63

*Steinhardt Group Inc. v. Citicorp,*
126 F.3d 144 (3d Cir. 1997) ................................................ 47

*Stevenson v. Commissioner,*
T.C. Memo. 1989-357, 1989 WL 80841 (1989) ..................... 61

*Sun Cap Partners III, LP v. New England Teamsters &*
*Trucking Indus. Pension Fund,*
943 F.3d 49 (1st Cir. 2019) ................................................. 31

*Texas Truck Parts & Tire, Inc. v. United States,*
No. 23-20588, 2024 WL 4439825 (5th Cir. Oct. 8, 2024)...... 32

*Thomas v. Perkins,*
301 U.S. 655 (1937) .............................................................. 33

**Cases (cont.):**                                                    **Page(s)**

*Thomas v. Reeves,*
   961 F.3d 800 (5th Cir. 2020) ....................................................51
*Tucker Anthony Realty Corp. v. Schlesinger,*
   888 F.2d 969 (2d Cir. 1989) ...................................................47
*United States v. Constantine,*
   296 U.S. 287 (1935) ...............................................................33
*United States v. Pelzer,*
   312 U.S. 399 (1941) ...............................................................33
*United States v. Wise,*
   370 U.S. 405 (1962) ...............................................................64
*Vitol, Inc. v. United States,*
   30 F.4th 248 (5th Cir. 2022) ..................................................49
*Wilmette Park Dist. v. Campbell,*
   338 U.S. 411 (1949) ...............................................................25
*Youmans v. Simon,*
   791 F.2d 341 (5th Cir. 1986) .................................................46

**Statutes:**

Internal Revenue Code (26 U.S.C.):

§ 464 (1976) ..............................................................................52
§ 464(c)(1)(B) (1976) ................................................................52
§ 464(c)(2) (1976) .....................................................................52
§ 702(a)(8) ...................................................................................2
§ 707(c) ................................................................................24, 57
§ 901(b)(1) ................................................................................32
§ 1402(a) .................................................................3, 20, 36, 61
§ 1402(a)(10) .....................................................................16, 53-55
§ 1402(a)(10)(A) ......................................................................54
§ 1402(a)(13) ....................................................................*passim*
§ 1402(b) ....................................................................................3
§ 3101(a) ...................................................................................19
§ 3111(a) ...................................................................................19
§ 5000A(b)(1) ...........................................................................33
§ 6226(a) (effective Aug. 5, 1997 to Dec. 31, 2017) .................1

15256045.1

**Statutes (cont.):** **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont.):

§ 7442 ................................................................. 1
§ 7482(a)(1) ........................................................ 2
§ 7701 ............................................................... 28

42 U.S.C.:

§ 405(c)(2)(A) ................................................... 61
§ 411(a) ............................................................ 60
§ 411(a)(12) ...................................................... 60
§ 411(d) ............................................................ 61

Health Security Act, H.R. 3600, 103d Cong., § 7141 (1993) .......... 64

Social Security Act of 1967, Pub. L. No. 90-248, § 118(a),
    81 Stat. 821 (1968) ........................................... 54

Social Security Act Amendment of 1950, Pub. L.
    No. 81-734, § 208(a), 64 Stat. 477 (1950) ............... 20-21

Social Security Amendments of 1977, Pub. L. No. 95-216,
    §§ 313(a), (b), 91 Stat. 1509, 1536-37 (1977) .......... 23

Tax Reform Act of 1976, P.L. 94-455, § 207,
    90 Stat. 1520 (1976) ......................................... 52

Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 935,
    111 Stat. 788 (1997) ......................................... 65

Revised Uniform Limited Partnership Act § 303 ............. 43

Revised Uniform Limited Partnership Act § 303(a) ......... 44

Revised Uniform Limited Partnership Act § 303(b) ......... 43

**Regulation:** **Page(s)**

Treasury Regulations (20 C.F.R.):

 20 C.F.R. § 404.1080(b)(3) ...............................60-61

26 C.F.R.:

 § 301.7701-1(a) .......................................28

**Rules:**

Fed. R. App. P.:

 Rule 13(a)(1)(A) ......................................2
 Rule 32(a)(5) ........................................68
 Rule 32(a)(6) ........................................68
 Rule 32(a)(7)(B) .....................................68
 Rule 32(f) ...........................................68

**Miscellaneous:**

143 Cong. Rec. S6694 (daily ed. Jun. 27, 1997) ...........65

1994 Del. Laws Ch. 258, § 20.............................34

Antonin Scalia & Bryan A. Gardner, *Reading the Law: The Interpretation of Legal Texts* (2012)...........37

Black's Law Dictionary (Rev. 4th ed. 1968) ...............44

Bromberg & Ribstein on Partnership, § 8.01[B] (2024-1 Supp.).......................37, 40, 46

Bromberg & Ribstein on Partnership, § 9.01[A] (2021-3 Supp.).......................44

Del. Code Ann. tit. 6, § 15-306(c) .......................34

**Miscellaneous (cont'd):**                                          **Page(s)**

Del. Code. Ann. tit. 6, § 17-214(d)................................................34

F. Hodge O'Neal, *Comments on Recent Developments in Limited Partnership Law*, 1978 Wash. U.L.Q. 669 (1978)................44

Final Report of the Advisory Council on Social Security (Dec. 10, 1938), available at www.ssa.gov/history/reports/38advise.html.........................19

Francis J. Troubat, *The Law of Commandatary and Limited Partnership in the United States* (1853)..........................38, 39

H.R. Rep. No. 81-1300 (1949)..............................................20-21, 50

H.R. Rep. No. 90-544 (1967)......................................................54-55

H.R. Rep. No. 94-658 (1975)..........................................................52

H.R. Rep. No. 95-702 (Part I) (1977) ....................................*passim*

Harold P. Packer & George J. Leibowitz, *Coverage of the Self-Employed Under the Old-Age and Survivors Insurance Program,* 36 Calif. L. Rev. 61 (1948).....................................18

Henry Campbell Black, A Law Dictionary (2d ed. 1910) ..............40

J. William Callison & Maureen A. Sullivan, *Partnership Law and Practice: General and Limited Partnerships* (2023-2024) ..............................................................................43

Jennings & Marsh, *Securities Regulation* (1968) .........................46

Michael K. Pierce, *Limited Partner Control and Liability under the Revised Uniform Limited Partnership Act*, 32 Sw. L.J. 1301 (1979).......................................................43

**Miscellaneous (cont'd):**            **Page(s)**

Partnership Questionnaire (Form 7104.
  Soc. Sec. Rep. P 16007C), available at
  https://www.ssa.gov/forms/ssa-7104.pdf ............................. 62

Rapalje & Lawrence, A Dictionary of American and
  English Law, Vol. II (1883) ..................................... 40

*Revenue Proposals*, Dep't of the Treasury (2024), available at
  https://home.treasury.gov/system/files/131/General-
  Explanations-FY2025.pdf ..................................... 60

S. Rep. No. 81-1669 (1950) .............................................. 21

S. Rep. No. 94-938 (Part 1) (1976) ............................... 52-53

U.S. Const. art. I, § 8, cl. 1 ........................................ 24

U.S. Const. art. VI, cl. 2 ............................................ 24

William Draper Lewis, *The Uniform Limited Partnership
  Act*, 65 U. Penn. L. Rev. 715 (1917) ........................... 37-39, 41

Webster's Third New International Dictionary (1968) ................. 55

15256045.1

# GLOSSARY

| | |
|---|---|
| Br. | Opening brief of Appellant Sirius Solutions |
| FPAA | Notice of Final Partner Administrative Adjustment |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| LLLP | Limited Liability Limited Partnership |
| MFA Br. | Brief of *Amicus* Managed Funds Association |
| POMS | Social Security Administration Program Operations Manual System |
| RER Br. | Brief of *Amicus* The Real Estate Roundtable, Inc. |
| RULPA | Revised Uniform Limited Partnership Act (1976) |
| SECA | Self-Employment Contributions Act, Pub. L. No. 81-734, § 208(a), 64 Stat. 540 (1950) |
| Sirius GP | Sirius Solutions GP, L.L.C. |
| Sirius | Sirius Solutions, L.L.L.P. |
| SSA | Social Security Administration |
| ULPA | Uniform Limited Partnership Act (1916) |
| 1950 Act | Social Security Act Amendment of 1950, Pub. L. No. 81-734, 64 Stat. 477 (1950) |
| 1977 Act | Social Security Amendments of 1977, Pub. L. No. 95-216, 91 Stat. 1509 (1977) |

# STATEMENT OF JURISDICTION

On June 12, 2020, the IRS issued to appellant, Sirius Solutions GP, L.L.C. ("Sirius GP"), tax matters partner for Sirius Solutions, L.L.L.P. ("Sirius"), a Notice of Final Partnership Administrative Adjustment ("FPAA").  The FPAA determined an adjustment to, *inter alia*, the amount that Sirius reported on its 2014 federal tax return (Form 1065 (U.S. Return of Partnership Income)) as net earnings from self-employment.  (ROA.87-ROA.96.)  On September 4, 2020, Sirius GP timely petitioned the Tax Court for readjustment of that FPAA adjustment (ROA.16-ROA.20).  *See* I.R.C. § 6226(a) (effective Aug. 5, 1997 to Dec. 31, 2017).  On June 21, 2021, the IRS issued to Sirius GP FPAAs determining similar adjustments to Sirius's 2015 and 2016 net earnings from self-employment.  (ROA.1631-ROA.1638; ROA.1639-ROA.1646.)  On September 17, 2021, Sirius GP timely filed a second Tax Court petition seeking readjustment of those additional FPAA adjustments (ROA.2680-ROA.2685).  Because they shared common questions, the two petitions were consolidated for trial, briefing, and opinion.  (ROA.1589.)  The Tax Court had jurisdiction under I.R.C. §§ 6226(a) and 7442.

On November 28, 2023, the Tax Court issued an opinion that effectively resolved the legal question presented in these petitions. *See Soroban Cap. Partners, LP v. Commissioner*, No. 16217-22, 2023 WL 8235164 (T.C. Nov. 28, 2023). The parties stipulated that *Soroban* "is precedential and applicable to the issues in this case[,]" although Sirius maintained that *Soroban* was incorrectly decided and stated its intention to appeal. (ROA.3751-ROA.3752.) On February 20, 2024, the Tax Court (Judge Urda) entered decisions upholding the IRS's adjustments. (*See* ROA.2655-ROA.2656; ROA.3816-ROA.3818.) Sirius filed timely notices of appeal (ROA.2657-ROA.2661; ROA.3819-ROA.3823). *See* Fed. R. App. P. 13(a)(1)(A). This Court has jurisdiction under 26 U.S.C. § 7482(a)(1).

## STATEMENT OF THE ISSUE

Social Security is a comprehensive national insurance program that provides benefits to workers to partially replace the income they lose when they cease working. It is funded by taxes on the wages paid by employers and self-employment income. Relevant here, self-employed individuals owe tax on their self-employment income, which includes, *inter alia*, a taxpayer's distributive share of income (*see* I.R.C.

§ 702(a)(8)) from any trade or business carried on by a partnership of which he is a member.  I.R.C. §§ 1402(a), (b).  In 1977, Congress became troubled by the marketing of schemes whereby taxpayers who were not covered by Social Security could obtain coverage—despite not performing work or services—by passively investing small amounts in limited partnerships and paying small amounts of self-employment tax. To correct this, Congress enacted an exclusion from the definition of self-employment income for "the distributive share of any item of income or loss of a limited partner, as such[.]"  I.R.C. § 1402(a)(13).  As it turns out, this correction now has engendered a problem on the other side of the same coin: individuals, like Sirius's individual partners, who actively provide services full-time in a partnership's business, but who rely on a state-law designation as "limited partner" to avoid paying any self-employment tax.  The question presented is:

Whether the Tax Court correctly determined that Sirius's individual partners, who performed services full-time in its business, were not limited partners for purposes of I.R.C. § 1402(a)(13) during the years 2014-2016.

## STATEMENT OF THE CASE

**A.    Relevant facts**

### 1.    Organization of Sirius and Sirius GP

Sirius is a Delaware limited liability limited partnership which is treated as a partnership for federal income tax purposes.  (ROA.65.) Originally formed as a limited partnership (ROA.144-ROA.145), Sirius converted to a limited liability limited partnership in 2002 (ROA.147-ROA.148).  Each of Sirius's individual partners at that time signed its Statement of Qualification as "General Partner."  (ROA.148.)

In 2005, Sirius amended its certificate to provide that Sirius GP was its general partner.  (ROA.149-ROA.150.)  Sirius GP is a Delaware limited liability company which is treated as a partnership for federal tax purposes.  (ROA.66.)  Sirius GP was organized for the "sole purpose * * * [of] serv[ing] as the general partner of [Sirius] and own[ing] a partnership interest in [Sirius]."  (ROA.156; ROA.220; ROA.272.)

Sirius's partners executed an amended limited partnership agreement in May 2005.  (ROA.297-ROA.338).  They executed a second amended limited partnership agreement in February 2009 and a third amended limited partnership agreement in August 2015.  (ROA.412-ROA.455; ROA.1804-ROA.1854.)

Under those agreements, Sirius's purpose is to "(i) provide business consulting services through project management, contract consulting, and global executive search" and other lawful activities. (ROA.417; ROA.1813.)  To that end, "the management and control of [Sirius] and its business, assets and affairs shall rest exclusively with [Sirius GP] * * *."  (ROA.421; ROA.1818.)  Despite these obligations, Sirius GP "shall not be entitled to receive any management fees or other compensation for its services" as general partner.  (ROA.423; ROA.1820.)  The agreements further require Sirius GP to establish and delegate to a Sirius board of directors "all of its rights, powers, authority and obligations to manage and control [Sirius's] business, assets and affairs."  (ROA.424; ROA.1820-1821.)  Finally, the agreements provide that "no Person other than a Limited Partner or his or her Affiliate shall own an interest in [Sirius GP]."  (ROA.424; ROA.1821.)

As for the individual partners, the agreements provide that they "shall [not] participate in the management or control of the business of [Sirius] other than to exercise such Limited Partner's rights and powers as a Limited Partner under this [agreement]" and that they "shall [not]

transact any business for [Sirius] or have any power to act for or bind [Sirius]." (ROA.418; ROA.1815.) Notwithstanding those broad statements, each individual partner also specifically agreed that "he or she will devote his or her full time and efforts to [Sirius] and he or she will not engage in any other employment, occupation or consulting activity[.]" (ROA.430-ROA.431; ROA.1829.) Any breach of that covenant, *i.e.*, engaging in employment outside Sirius, was deemed to constitute a voluntary withdrawal as partner and was subject to harsh monetary penalties. (ROA.431; ROA.1829.) And if an individual partner ever "seeks or is offered employment by any other company, firm, or person" they must furnish a copy of the confidentiality and non-compete provisions to that employer. (ROA.432; ROA.1831.)

In 2014, Sirius was owned by nine individual partners and Sirius GP, which held a 0.6457% interest. (ROA.72-ROA.73.) In 2015 and 2016, Sirius was owned by five individual partners and Sirius GP, which held a 0.7529% interest. (ROA.82-ROA.83; ROA.1627.)

Sirius GP was wholly owned by some of Sirius's individual partners. (ROA.83-ROA.84; ROA.1627-ROA.1628.) Sirius GP did not

provide services to any entity besides Sirius during the years at issue. (ROA.3700.)

### 2. Sirius's business and the activities of the individual partners

From the date of its organization, Sirius has operated a consulting services practice. (ROA.3098.) It does not sell any goods or products. (ROA.3098.)

Commensurate with their obligations under the partnership agreements, each of the individual partners "worked exclusively for Sirius and devoted large amounts of their time to Sirius during the tax years 2014, 2015, and 2016." (ROA.3099.) Indeed, they all "worked full time on the business of" Sirius. (ROA.3700-ROA.3705.) Notwithstanding the provision in Sirius's partnership agreement that the individual partners "shall [not] participate in the management or control of the business of [Sirius]," they each exercised significant control over Sirius's business during the years at issue. Kristi Chickering was the Chief Executive Officer. (ROA.3701.) Mark Hendrix ran the Energy Consulting/Technology Services consulting line. (ROA.3701-ROA.3702.) Thomas Bauer oversaw various service lines. (ROA.3702.) Evelyn Aucoin, William Mansfield, and Jill Finke

"oversaw teams selling and delivering consulting services to clients."
(ROA.3702; ROA.3704.)  Colleen Estes and James Jackson co-ran the
Business Process and Controls consulting line.  (ROA.3703.)  Brent
Price ran the Financial Advisory Services consulting line.  (ROA.3705.)
Further, each of the individual partners:

- Delivered services on client engagements;
- Developed Sirius's business;
- Supervised staff;
- Billed hours on client engagements;
- Selected staff for specific engagements;
- Negotiated client engagements; and
- Participated in decisions to hire, evaluate, and terminate staff.

(ROA.3099.)  In carrying out these duties, the individual partners
signed documents, including client agreements, identifying themselves
as "Partner."  (*See*, *e.g.*, ROA.3280-ROA.3329.)

The board of directors of Sirius GP did not hold formal meetings,
and received no compensation for services, in any of the years at issue.
(ROA.1936; ROA.3099.)  Nor do Sirius or Sirius GP have any
memoranda or minutes of meetings of the Sirius board of directors for
those years.  (ROA.1630; ROA.1936.)

### 3.    Sirius's federal income-tax reporting

Sirius timely filed tax returns for 2014, 2015, and 2016, reporting $5,829,402, $7,242,984, and -$490,291 in ordinary business income respectively.  (ROA.65; ROA.1626; *see* ROA.97-ROA.139; ROA.1647-ROA.1703; ROA.1704-ROA.1766.)  Sirius did not allocate any of that income to Sirius GP, despite its ownership interest.  (ROA.107; *see* ROA.1767-ROA.1778; ROA.1779-ROA.1800.)  Rather, Sirius allocated all of its income to the individual partners.  (ROA.105-ROA.124; ROA.138; ROA.1675-1691; ROA.1739-ROA.1755.)  Sirius did not report any net earnings from self-employment to any of the individual partners.  (ROA.1365-ROA.1366; ROA.1628-ROA.1629.)

### 4.    The examination and adjustments

For the years at issue, the IRS determined that Sirius's "individual partners [were] not 'limited partners' within the meaning of [I.R.C.] § 1402(a)(13), and thus their distributive shares of the partnership's ordinary business income are not excluded from their net earnings from self-employment."  (ROA.95; ROA.2693; ROA.2701.)  In total, the IRS determined that the net earnings from self-employment were $5,915,918, $7,372,756, and -$490,291, for 2014, 2015, and 2016

respectively, and not, as reported by Sirius, $0.[1]  (ROA.95; ROA.2691;

ROA.2699.)

## B.    Proceedings in the Tax Court

Sirius petitioned the Tax Court for readjustment.  (ROA.16-

ROA.20; ROA.2680-ROA.2685.)  It maintained that its individual

partners were limited partners for purposes of § 1402(a)(13) because

they were persons "admitted to a limited partnership as a limited

partner" under Delaware law.  (ROA.878); *see also* (ROA.1215 ("The

only fact necessary for the Court to grant summary judgment is that the

Limited Partners are state-law limited partners under Delaware

law.")).  The Commissioner asserted, in contrast, that the term "limited

partner" as used in § 1402(a)(13) "is nuanced and complex, is based on

functions performed by individuals, and is not controlled by any

particular state's law."  (ROA.1297.)  He explained that, when Congress

---

[1] The amounts for 2014 and 2015 differ from the amounts Sirius
reported as ordinary business income in those years because the FPAAs
denied certain claimed deductions.  (ROA.93; ROA.1636.)  Sirius did not
challenge those determinations.  (ROA.16-20; ROA.2680-ROA.2685.)
For 2016, although the IRS determined an aggregate negative amount
of net earnings from self-employment, only Chickering had a negative
distributive share (-$1,650,312).  (ROA.1739.)  The remaining
individual partners all had positive distributive shares.  (ROA.1745-
ROA.1755.)

enacted the limited-partner exclusion, it "neither anticipated nor intended that individuals who report to their place of business each workday, work full time at that business, and manage or control the business should escape their obligations to the self-employment tax regime." (ROA.1298.) The question whether one is a limited partner for those purposes turns on "the actions of the partners, and not * * * state law formalities." (ROA.1298.)

While the case was pending, the Tax Court issued its opinion in *Soroban*, which decided the same issue presented here, holding that a functional test should apply to determine whether a person called a limited partner under state law is a limited partner for purposes of § 1402(a)(13). That is, "the limited partner exception does not apply to a partner who is limited in name only." *Soroban*, 2023 WL 8235164, at *6. Rather, "Congress intended for this limited partner exception to apply to earnings of an investment nature[,]" and "determin[ing] whether earnings allocated to limited partners are of an investment nature necessarily requires an inquiry into the functions and roles of the limited partners." *Soroban*, 2023 WL 8235164, at *1.

The parties stipulated that *Soroban* was applicable to this case and that, under that opinion, Sirius's individual partners were not limited partners for purposes of § 1402(a)(13).  (ROA.2590.)  Sirius maintained, however, that *Soroban* was wrongly decided and that "the proper test for purposes of I.R.C. § 1402(a)(13) is whether the partners are limited partners under the applicable state law regime[.]" (ROA.2591.)

Accordingly, the Tax Court entered decisions upholding the Commissioner's adjustments to, among other things, Sirius's net earnings from self-employment for 2014, 2015, and 2016.  (ROA.2655-ROA.2657; ROA.3816-ROA.3818.)  Sirius GP now appeals.

## SUMMARY OF ARGUMENT

The Tax Court correctly held that Sirius's individual partners were not limited partners for purposes of § 1402(a)(13).  That holding is in keeping with fundamental principles of federal taxation, the plain language of the statute, the context and purpose of the statute, and its legislative history.  The arguments of Sirius and the *amici* to the contrary all lack merit.

Three fundamental principles of federal taxation support the Tax Court's interpretation of the statute. First, federal—not state—law controls interpretation of a federal tax statute. Although state law may create legal rights and interests, federal law determines the federal tax consequences, regardless of the name given under state law. Specifically, federal—and not state—law controls an entity's classification for federal tax purposes. It follows that an individual's status vis-à-vis a particular entity, so far as it matters for federal tax purposes, also is inherently a federal question. Second, tax law deals in economic realities, not legal abstractions. Federal tax law is concerned with the substance of an arrangement; labels do not control. Third, federal tax laws are construed to establish a uniform system of federal taxation across all states.

The state-law-based approach championed by Sirius and the *amici* would create an unpredictable patchwork scheme of federal self-employment taxation dependent upon the unique definitions of "limited partner" under the fifty states' laws. The Tax Court's approach, in contrast, looks past the label attached by state law to the substance of an individual partner's status and activities. It asks whether, as a

matter of economic reality, an individual is acting like a limited partner investor in the sense intended by § 1402(a)(13), or rather is acting like a self-employed person, generating income from his labors.  That Congress intended such a uniform objective inquiry makes sense, because it comports with the usual understanding of "limited partner" when Congress enacted § 1402(a)(13) in 1977: mere investors, and not individuals active in the partnership's business, are afforded limited liability.

Indeed, from its inception until recently the limited partnership was a form of partnership consisting of two types of partners: general partners who actively control and conduct the business, and limited partners who passively invest capital in the business.  Such was the case under the European precursors as well as the early American limited partnership provisions which generally precluded limited partners from transacting business for the partnership on danger of being treated as a general partner.  Although that prohibition has softened over time, it remained in 1977 a defining feature of the limited partnership form that the business was managed and conducted by one

or more general partners, while the limited partners provided capital and refrained from managing or conducting the business.

The statutory context confirms this traditional understanding of a limited partner was what Congress meant when it enacted the statute. Section 1402(a)(13) was enacted for the specific purpose of closing a loophole created by the inclusion of partners' distributive shares in the definition of net earnings from self-employment without regard to the nature of their relationship to the partnership, *viz.*, to stop limited partners who invested a small amount in a business from obtaining Social Security coverage without working.

The legislative history further confirms this interpretation. Congress expressly identified that issue as the motivating force behind § 1402(a)(13), and enacted it to exclude earnings of an investment nature from Social Security coverage. Congress never intended that the converse be true: that individuals, like Sirius's individual partners, could earn income working full-time in the business of a partnership and nevertheless avoid the self-employment tax (and coverage under Social Security) simply by obtaining the state-law label "limited partner."

Sirius's and the *amici*'s arguments to the contrary lack merit. First, no negative inference can be drawn from § 1402(a)(10), which excepts from coverage payments by a partnership to retired partners. That section merely draws a distinction between payments to a partner on account of his services and payments to a partner after he ceases working.

Second, the Tax Court's approach does not render the "guaranteed payments" clause mere surplusage. It is not the government's position that the provision of *any* services to a limited partnership deprives an individual of limited-partner status under § 1402(a)(13). Only those who, like Sirius's individual partners, perform extensive services akin to a self-employed person are not limited partners under that exclusion. Where an individual provides *some* services (*i.e.,* minor) to the partnership but overall earns their distributive share as a return on investment, their distributive share qualifies for the exclusion, and any guaranteed payments in the nature of remuneration for their services are subject to self-employment tax.

Third, IRS and Social Security Administration publications do not contradict the government's position. The Form 1065 instructions, for

example, simply refer to a limited partner who is not so pervasively involved in the conduct and management of the business so as not to qualify as a limited partner under § 1402(a)(13). Similarly, the relevant Social Security Administration regulation itself references control and services provided by the partner in determining whether the partner is a limited partner. Moreover, the SSA follows the Internal Revenue Code's definition of partnership-related items, and where the IRS collects and reports self-employment taxes, the SSA credits those payments for purposes of calculating benefit eligibility.

Fourth, failed legislative proposals to revoke or amend § 1402(a)(13) do not inform the meaning of that statute when enacted in 1977. The views of a subsequent Congress are a hazardous basis for inferring the intent of an earlier one, especially when those views are "expressed" through failure to enact amendments. For similar reasons, Congress's 1997 moratorium on certain proposed regulations also does not inform the meaning of § 1402(a)(13).

In short, the Tax Court's interpretation of § 1402(a)(13) is correct, and its decision should be affirmed.

# ARGUMENT

**The Tax Court correctly determined that the individual partners of Sirius were not limited partners for purposes of I.R.C. §1402(a)(13)**

## Standard of review

This case presents an issue of statutory interpretation which this Court reviews *de novo*. *Kovac v. Wray*, 109 F.4th 331, 334-35 (5th Cir. 2024).

## A. Social Security and self-employed individuals

The Social Security Act and related legislation establish "a comprehensive national insurance system that provides benefits for retired workers, disabled workers, unemployed workers, and their families." *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 48 (2011). Generally speaking, the Social Security program has broad remedial purposes, including providing "for the decent support of elderly workmen who have ceased to labor." *Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358, 640 (1946). Initially, Social Security did not provide coverage for self-employed individuals—not because Congress believed that the self-employed should not be insured against loss of income from work—but due to the "administrative impracticability" of determining their income and collecting contributions. *See generally* Harold P.

Packer & George J. Leibowitz, *Coverage of the Self-Employed Under the Old-Age and Survivors Insurance Program*, 36 Calif. L. Rev. 61, 61-62 (1948). As explained by the 1938 Advisory Council on Social Security, including "those persons working on their own account" would serve two purposes: "Not only would the inclusion of this group be socially desirable, but it would also be a marked advantage in planning the financial program of the system." Final Report of the Advisory Council on Social Security, at 40-41 (Dec. 10, 1938);[2] *see also* Packer & Leibowitz, 36 Calif. L. Rev., at 67-68 ("[A] self-employed person should contribute only on the income he receives for his personal services. This is essential if equal treatment is to be accorded to employees covered under the program and the self-employed. It is also essential if coverage of the self-employed is to be in keeping with the underlying purpose of the program, namely to provide protection against the loss of earning by reason of old age or death."). Originally, Social Security was funded only through a tax on wages employers pay employees (currently codified at I.R.C. §§ 3101(a), 3111(a)).

---

[2] Available at www.ssa.gov/history/reports/38advise.html (last visited Sept. 17, 2024).

In 1950, Congress added coverage for the self-employed. *See* Social Security Act Amendment of 1950 ("1950 Act"), Pub. L. No. 81-734, § 103(a), 64 Stat. 477, 502, 504 (1950). In doing so, Congress "reaffirm[ed] the basic principle that a contributory system of social insurance in which workers share directly in meeting the cost of the protection afforded is the most satisfactory way of preventing dependency. A contributory system, in which both contributions and benefits are directly related to the individual's own productive efforts, prevents insecurity while preserving self-reliance and initiative." H.R. Rep. 81-1300, at 2 (1949).

At the same time, Congress added a new funding mechanism in the form of a tax on the self-employment income of the self-employed. 1950 Act, § 208(a), 64 Stat. 540 (Self-Employment Contributions Act ("SECA")) (currently codified at I.R.C. §§ 1401-1403). In extending Social Security coverage to the self-employed, Congress intended "self-employment income [to be] taken into account for benefit purposes to the same extent as wages[.]" H.R. Rep. 81-1300, at 10. The 1950 Act defined the term "net earnings from self-employment" (now codified at I.R.C. § 1402(a)) to mean: "the gross income derived by an individual

from any trade or business carried on by such individual * * * plus his distributive share (whether or not distributed) of income or loss * * * from any trade or business carried on by a partnership of which he is a member[.]" 1950 Act, § 208(a), 64 Stat. 540. As respects partnership income, this definition encompassed a self-employed partner's distributive share of all income "derived by the partnership from carrying on a trade or business * * * irrespective of the nature of his membership, as for example, as a limited or inactive member." H.R. Rep. 81-1300, at 137; *see also* S. Rep. No. 81-1669, at 155. That is, even limited or inactive members of a partnership were obligated to pay self-employment tax on their distributive shares of a partnership's ordinary trade or business income. *Ellsasser v. Comm'r*, 61 T.C. 241 (1973).

Such was the state of affairs until 1977. By then, however, Congress "ha[d] become increasingly concerned about situations in which certain business organizations solicit[ed] investments in limited partnerships as a means for an investor to become insured for social security benefits." H.R. Rep. 95-702 (Part I), at 40-41 (1977). Specifically, those "advertisements and solicitations [were] directed mainly toward public employees whose employment [was] covered by

public retirement systems and not by social security." *Id.* at 41.

Because net earnings from self-employment included any individual

partner's distributive share of partnership ordinary business income,

regardless of whether the partner was a limited or inactive partner, an

uncovered individual could invest a small sum in a limited partnership,

perform no services for the partnership, and nevertheless obtain Social

Security coverage by virtue of being allocated their distributive shares.

This concerned Congress because "[i]n these situations the investor in

the limited partnership performs no services for the partnership and

the social security coverage which results is, in fact, based on income

from an investment." *Id.* Congress felt that that outcome was "of

course inconsistent with the basic principle of the social security

program that benefits are designed to partially replace lost earnings

from work." *Id.*

Another distortion created by those limited-partnership

investments concerned Congress. Such an investor would "eventually

gain a high return on their social security contributions[,]" because they

needed only to invest just enough in a limited partnership to generate

distributive shares qualifying for minimum benefits, "which are heavily

weighted for the purpose of giving added protection for people who have worked under social security for many years with low earnings." *Id.* Congress was troubled that the "cost of paying these heavily weighted benefits to limited partners must, of course, be borne by all persons covered by the social security program." *Id.* And Congress believed that these schemes "injure[d] the social security program in the public view and cause[d] resentment on the part of the vast majority of workers whose employment is compulsorily covered under social security, as well as those people without work income who would like to be able to become insured under the social security program but cannot afford to invest in limited partnerships." *Id.*

Accordingly, Congress amended the Social Security Act and the Internal Revenue Code to exclude from the definition of "net earnings from self-employment" the distributive share of income or loss received by a "limited partner." *See* Social Security Amendments of 1977 ("1977 Act"), Pub. L. No. 95-216, §§ 313(a), (b), 91 Stat. 1509, 1536-37 (1977). Consistent with the concerns that precipitated it, this change was meant "to exclude for coverage purposes certain earnings which are basically of an investment nature." H.R. Rep. 95-702 (Part 1), at 11.

This case concerns the interpretation of that exception:

> There shall be excluded the distributive share of any item of income or loss of a limited partner, as such, other than guarantee payments described in section 707(c) to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration for those services[.]

I.R.C. § 1402(a)(13).

## B. Fundamental principles of federal taxation dictate the approach taken by the Tax Court

Three foundational principles of federal tax law support the Tax Court's approach and undermine the approach that Sirius and the *amici* urge. First, federal—not state—law controls interpretation of a federal tax statute. Second, federal tax law generally is concerned with economic realities; labels do not control. Third, federal tax law should be uniform nationwide.

### 1. Federal—not state—law controls interpretation of a federal tax statute

Sirius and the *amici* assert (Br. 10-20; RER Br. 8-15) that Delaware partnership law controls the interpretation of § 1402(a)(13). But federal law governs federal tax statutes. *See* U.S. Const. art. I, § 8, cl. 1 (taxing power) & art. VI, cl. 2 (supremacy clause). Congress's choices in the tax arena are "not subject to state control." *Burnet v.*

*Harmel*, 287 U.S. 103, 110 (1932) (rejecting argument that state-law characterization of oil-and-gas lease governed federal tax consequences); *see also Lyeth v. Hoey*, 305 U.S. 188, 193 (1938) (construction of a "federal tax statute is not determined by local law"). Rather, "[i]n dealing with the meaning and application of an act of Congress enacted in the exercise of its plenary power under the Constitution to tax income and grant exemptions from that tax, it is the will of Congress which controls[.]" *Lyeth*, 305 U.S. at 194. And the question of the interpretation of a term "within the meaning of the federal statute necessarily is a federal question. It is not determined by local characterization." *Id.*

Although state law may "create[ ] legal interests and rights," federal law determines the federal tax consequences, "no matter what name is given to the interest or right by state law." *Morgan v. Commissioner*, 309 U.S. 78, 80-81 (1940); *see Wilmette Park Dist. v. Campbell*, 338 U.S. 411, 412, 418-19 (1949) (application of federal tax "not controlled by" local-law characterization); *Air Power, Inc. v. United States*, 741 F.2d 53, 56 (4th Cir. 1984) (holding that state court was a "court of record" under federal tax law, notwithstanding state statute

classifying it as a "court not of record"); *Maines v. Commissioner*, 144 T.C. 123, 132 (2015) ("a particular label given to a legal relationship or transaction under state law is not necessarily controlling for federal tax purposes"); *Kraatz & Craig Surveying, Inc. v. Commissioner*, 134 T.C. 167, 180 (2010) ("The meaning of the words or the legal status of circumstances for federal tax purposes need not be identical to their meaning or their legal effect under state law."); *cf. California v. Buzard*, 382 U.S. 386, 394 (1966) (although California "expressly denominate[d]" a certain car-registration tax as "a 'license fee,'" the Court nevertheless undertook to "decide as a matter of federal law what 'licenses, fees, or excises' mean[t] in the [Soldiers' and Sailors' Civil Relief Act of 1940]" where there was "no persuasive evidence Congress meant state labels to be conclusive").

*Morgan* illustrates this general principle. That case required the Court to determine whether a particular power of appointment was "general" within the meaning of the federal estate tax statute that required a decedent's gross estate valuation to include any property "passing under a general power of appointment." *Morgan*, 309 U.S. at 79 & n.1. The federal statute did not define the term "general power of

appointment." *Id.* at 81. But the Court held that "when it used the adjective 'general[,]'" Congress must have had in mind "the distinction usually made between a general and a special power[.]" *Id.* at 81. And because the characteristics of the power in question aligned more closely with that usual understanding of a general power, the Court rejected the taxpayer's argument that the power should be treated as special because the relevant state statute specifically defined it as special. *Id.* at 80 & n.1. It held that the power was "general within the intent of the Revenue Act, notwithstanding [that it] may be classified as special by the law of Wisconsin." *Id.* at 80; *see also id.* at 81 ("the federal law must prevail no matter what name is given to the interest or right by state law"); *cf. Lehman v. United States*, 448 F.2d 1318, 1319 (5th Cir. 1971) (construing later version of federal statute which defined "general power of appointment" (I.R.C. § 2041(b)(1)) and holding that decedent "enjoyed a general power of appointment for Federal estate tax purposes regardless of the label attached to her interest by State courts").

More specifically, federal—and not state—law controls an entity's classification as, *e.g.*, a corporation, trust, or partnership for federal tax

purposes.  *See*, *e.g.*, I.R.C. § 7701 (defining terms including corporation, partnership, and partner); Treas. Reg. (26 C.F.R.) § 301.7701-1(a) ("Whether an organization is an entity separate from its owners for federal tax purposes is a matter of federal tax law and does not depend on whether the organization is recognized as an entity under local law.").

The courts have long recognized this principle.  In the early days of the federal income tax, the Supreme Court held that an unincorporated joint-stock association, which state law deemed a partnership and "not an entity," was—for federal tax purposes—an "association" taxed as a "corporation."  *Burke-Waggoner Oil Ass'n v. Hopkins*, 269 U.S. 110, 111-14 (1925).  The Court explained that state law was not of "legal significance" in analyzing Congress's power to tax the entity as a corporation.  *Id.* at 114.  And just last term, the Supreme Court reiterated that principle:

> Neither the conception of unincorporated associations prevailing under the local law, nor the relation under that law of the association to its shareholders, nor their relation to each other and to outsiders, is of legal significance as bearing upon the power of Congress to determine how and at what rate the income of the joint enterprise shall be taxed.

*Moore v. United States*, 144 S. Ct. 1680, 1689 (2024) (quoting *Burke-Waggoner*, 269 U.S. at 114). *See also Britt v. United States*, 431 F.2d 227, 237 (5th Cir. 1970) ("The fact that a state has conferred a label of 'corporation' on a business organization should not per se control its status for federal tax purposes."); *Second Carey Tr. v. Helvering*, 126 F.2d 526, 528-29 (D.C. Cir. 1942) ("express trust" under Oklahoma law was, under federal law, an association taxable as a corporation); *Commissioner v. Fortney Oil Co.*, 125 F.2d 995, 997 (6th Cir. 1942) (federal law controlled whether an entity was an "association" that was federally taxable as a corporation). This is especially true for partnerships. Every state has its own definition of "partnership" and "partner," but those state-law labels are not controlling for federal tax purposes. *See*, *e.g.*, *Commissioner v. Tower*, 327 U.S. 280 (1946); *Commissioner v. Culbertson*, 337 U.S. 733 (1949) (establishing standards for whether a partnership is *bona fide* for federal tax purposes).

It follows that an individual's status vis-à-vis a particular entity, so far as it matters for federal tax purposes, also is inherently a question of federal—not state—law. *See*, *e.g.*, *Heiner v. Mellon*, 304

U.S. 271, 279 (1938). *Heiner* concerned the question whether two individuals owed income tax on their distributive shares as partners in two partnerships. The partnerships were dissolved by operation of law when a third member died, but the survivors continued to operate the business during the years in question. *Heiner*, 304 U.S. at 277. They argued that, upon dissolution, they ceased to be partners and were designated under Pennsylvania law as "liquidating trustees[.]" *Id.* at 278-79. This mattered because federal tax law treated a trust estate as a separate taxable entity, such that any income tax would be due from the trust and not the individuals personally. *Id.* (citing § 219 of the Revenue Act of 1918, 40 Stat. 1071).

The Supreme Court rejected the taxpayers' argument because they were "not trustees within the meaning of section 219." *Id.* at 279. "The fact that they may be so denominated by Pennsylvania law" was "not conclusive" because "it is well settled that in the interpretation of the words used in a federal revenue act, local law is not controlling unless the federal statute 'by express language or necessary implication, makes its own operation dependent upon state law.'" *Id.* (quoting *Burnet*, 287 U.S. at 110). And the Court thought it "clear that

under the circumstances set forth, the income earned in 1920 was income of a partnership 'carrying on a business' within the meaning of section 218 rather than of a trust under section 219." *Id.* The Supreme Court recently reaffirmed this holding. *See PPL Corp. v. Commissioner*, 569 U.S. 329, 335 (2013) (citing *Heiner* for the proposition that "state-law definitions [are] generally not controlling in federal tax context").

## 2. Federal tax law is concerned with economic realities; labels do not control

Not only does state law not dictate the interpretation of the federal tax code, but more generally federal "tax law require[s] courts to look beyond how parties label, or structure, themselves. Courts must rather look to the substance of the relationships." *Sun Cap Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 943 F.3d 49, 57, 59 (1st Cir. 2019). As explained by the Supreme Court, "tax classifications" turn on the "'objective economic realities of a transaction rather than . . . the particular form the parties employed.'" *Boulware v. United States*, 552 U.S. 421, 429 (2008) (ellipse in original; citation omitted). For it is a "black-letter principle that 'tax law deals in economic realities, not legal abstractions[.]'" *PPL Corp.*, 569 U.S. at 340 (citation omitted). This Court recently affirmed that it is "indisputable"

that "in the field of taxation, substance governs over form." *Texas Truck Parts & Tire, Inc. v. United States*, No. 23-20588, 2024 WL 4439825, at *6 (5th Cir. Oct. 8, 2024).

*PPL* is instructive. That case involved the question whether a "windfall tax" imposed by the United Kingdom on certain companies that had recently been privatized was creditable for U.S. tax purposes under I.R.C. § 901(b)(1), which provides that "any 'income, war profits, and excess profit taxes' paid overseas are creditable against U.S. income taxes." *PPL Corp.*, 569 U.S. at 331. In deciding that question, the Court held that "the way a foreign government characterizes its tax is not dispositive with respect to the U.S. creditability analysis." *Id.* at 335. "Instead of the foreign government's characterization of the tax, the crucial inquiry is the tax's economic effect." *Id.* at 335. The Court held that "the substance of the windfall tax" there was "that of an income tax in the U.S. sense" based upon an analysis of its "economic effect[.]" *Id.* at 337, 339.

Similarly, when considering the constitutionality of the Affordable Care Act's "shared responsibility payment," the Supreme Court held that it was a "tax" notwithstanding that the Act itself labeled it a

"penalty." *National Fed. of Ind. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012); *see* I.R.C. § 5000A(b)(1). The Court held that the "label" (penalty) did not control. *Id.* at 564. Rather, the Court employed a "functional approach" that "disregard[ed] the designation of the exaction, and view[ed] its substance and application." *Id.* at 565 (quoting *United States v. Constantine*, 296 U.S. 287, 294 (1935)).

Here, the relevant question is not whether the individual partners are labeled as limited partners under the law of Delaware or some other state, but whether they are, in substance, functioning as limited partners as Congress understood the term when it enacted § 1402(a)(13).

### 3. Federal tax law should be uniform nationwide

Federal tax laws are construed "to establish a nationwide scheme of taxation uniform in its application." *United States v. Pelzer*, 312 U.S. 399, 402-03 (1941); *see also Lyeth*, 305 U.S. at 194; *Thomas v. Perkins*, 301 U.S. 655, 659 (1937); *Burnet*, 287 U.S. at 110; *C.M. Thibodaux Co. v. United States*, 915 F.2d 992, 996 (5th Cir. 1990). But the approach pressed by Sirius and the *amici* would do exactly the opposite—it would create an unpredictable patchwork scheme of federal self-employment

taxation dependent upon the unique definitions of "limited partner" under the fifty states' laws, which may vary (and historically have varied) not only across state borders but also across time.[3]

As *Lyeth* explained, such a disjointed, state-law based approach to federal taxation should be avoided. That case involved whether property received by a taxpayer from an estate as settlement of his claim as an heir of the estate was taxable income, given that the Code exempts from income tax the value of property acquired by gift, bequest, devise, or inheritance. *Lyeth*, 305 U.S. at 189, 191 (citing I.R.C. § 22(b)(3) as then in effect). The question whether property received under an agreement settling a probate dispute was "acquired by inheritance" had been answered differently by various state courts, and the lower court had applied the law of the state where the property was received. *Id.* at 193. But the Supreme Court held that that was error because "the construction of the exemption in the federal statute

---

[3] Indeed, Sirius Solutions L.L.L.P. itself is a form of entity that did not exist when Congress enacted § 1402(a)(13). Limited liability limited partnerships were first authorized under Delaware law in 1994. *See* 1994 Del. Laws Ch. 258, § 20. And although Sirius argues (Br. 7, 10) that the hallmark of limited-partner status is limited liability under state law, in a Delaware LLLP even the *general* partner enjoys limited liability (*see* Del. Code Ann. tit. 6, §§ 15-306(c), 17-214(d)).

is not determined by local law." *Id.* Rather, "the question whether what the heir has thus received has been 'acquired by inheritance' within the meaning of the federal statute necessarily is a federal question. It is not determined by local characterization." *Id.* Because Congressional tax enactments "should be interpreted 'so as to give a uniform application to a nation-wide scheme of taxation'" (*id.*, quoting *Burnet*, 287 U.S. at 110), the question of the meaning of the phrase "acquired by inheritance" "should not be decided in one way in the case of an heir in" one state "and in another way in the case of an heir" in a different state, "according to the differing views of the state courts" (*id.*).

That is exactly what the Tax Court's functional test for applying § 1402(a)(13) avoids here. It looks past the label attached by any particular state's law at any particular time and examines the substance of an individual partner's status and activities. In this way, it adheres to the principle that federal taxation concerns substance and not labels, and provides a "uniform rule" that "is not decided in one way in the case of" a limited partner in one state "and in another way in the case of" a limited partner in a different state "according to the differing views of the state courts" or legislatures. *Lyeth*, 305 U.S. at 194. It

asks whether, as a matter of objective economic reality, an individual is, on the one hand, acting like a limited partner investor in the sense intended by Congress in enacting § 1402(a)(13), or, on the other hand, is acting like a self-employed person who is earning income as a result of his labors and thus is subject to the general rule of self-employment taxation under § 1402(a). And that objective inquiry comports with the "usual" understanding (*Morgan*, 309 U.S. at 80) of the term "limited partner" in 1977 when Congress enacted § 1402(a)(13).

### C. The ordinary meaning of "limited partner" in 1977 was a partner whose distributive share was basically of an investment nature

With these principles in mind, it remains for this Court to determine, as a matter of federal law, what Congress meant by "limited partner, as such" when it enacted § 1402(a)(13) in 1977. To do so, this Court, like the Supreme Court in *Morgan*, should look to the "usual" understanding (309 U.S. at 80) of that term at that time. *See also*, *e.g.*, *Perrin v. United States*, 444 U.S. 37, 42 (1979) (courts should interpret words of a statute consistent with their "ordinary meaning * * * at the time Congress enacted the statute"). Sirius argues (Br. 10) that the ordinary meaning of "limited partner" in 1977 was "a partner with

limited liability—commonly understood as a state-law limited partner." But, as shown above, the label attached by any particular state does not control interpretation of federal tax law. And, in any event, the definition Sirius offers only tells half the story. Its focus on "the hyperliteral meaning" of limited partner does not "[a]dhere[ ] to the *fair meaning* of the text" (*Mejia v. Barr*, 952 F.3d 255, 260 (5th Cir. 2020) (quoting Antonin Scalia & Bryan A. Gardner, *Reading the Law: The Interpretation of Legal Texts*, at 356 (2012) (emphasis in original))), because it omits a key aspect of limited partnership: limited partners traditionally were passive investors who did not take an active role in the management or operation of the partnership's business. *See* Bromberg & Ribstein on Partnership, § 8.01[B], at 8-4 (2024-1 Supp.) (describing "typical hierarchy of limited partnerships" as "passive limited partners and controlling general partners"). It was that aspect of limited partnership that Congress had in mind when it enacted § 1402(a)(13).

### 1. Historically a limited partner did not participate in the activities of the partnership

The concept of limited partnership can be traced back to the Middle Ages. *See* William Draper Lewis, *The Uniform Limited*

*Partnership Act*, 65 U. Penn. L. Rev. 715 (1917) ("Lewis").[4]  It originally

developed as a form by which one with capital could invest and reap the

benefits of commerce without actually engaging in that commerce:

> At a period when capital was in the hands of nobles and
> clergy, who, from pride or caste, or canonical regulations,
> could not engage directly in trade, it afforded the means of
> secretly embarking in commercial enterprises and reaping
> the profits of such lucrative pursuits without personal
> risks[.]

*Id.* at 717 (quoting *Ames v. Downing*, 1 Bradf. 321 (N.Y. Sur. 1850)).

The precursors to the American limited partnership were the French

*Société en Commandite* and the Italian *Accomandita.  See* Francis J.

Troubat, *The Law of Commandatary and Limited Partnership in the*

*United States*, at 34-36 (1853) ("Troubat").  Under those systems, "the

dominion and *jus formale* of the business vest[ed] in the general

partner, who possesse[d] the mastership, the exclusive or entire use of

the money or other property intrusted to him, and of the business

committed to his care; and the special partner [was] neither the master

nor the joint possessor, but merely the creditor of the capital which he

---

[4] Lewis was the draftsman of the ULPA.  *See* Lewis, 65 U. Penn.
L. Rev. at 715.

ha[d] contributed,—sharing, or to share, simply in the gains or losses of the concern[.]" Troubat, at 38.

Based on those early forms, limited partnerships were first adopted in the United States in New York in 1822 with other states following suit. *See* Lewis, 65 U. Penn. L. Rev., at 716. Under those early statutes, to obtain limited liability, a limited partner was required not only to "exactly conform[ ] to the statutory requirements" but also to "refrain[ ] from participation in the conduct of the business." Lewis, 65 U. Penn. L. Rev., at 720. And, "on any participation in the conduct of his business[,]" a limited partner "los[t] his privilege of limited liability, and bec[ame], as far as those dealing with the business [were] concerned, in all respects, a partner." *Id.*

Summarizing the early law of several states, Troubat wrote that they all provided that a limited partner "shall not transact any business on account of the partnership, nor be employed for that purpose as agent, attorney, or otherwise. If he shall interfere contrary to these provisions, he shall be deemed a general partner." Troubat, at 313; *see also id.* at 56 (quoting the original Pennsylvania statute); *see also*, *e.g.*, *Skolny v. Richter*, 124 N.Y.S. 152, 156 (App. Div. 1910) (under New

York law, "'the general partners only may transact the business of the partnership'"; the limited (special) partner "'may not * * * transact any business on account of the partnership'") (quoting the then-current version of New York's limited-partnership statute). Thus, from the start, the American limited partnership, like its French predecessor, was one in which the limited partner "so far as concerns his relations to his general partners, [was] treated as a mere contributor of capital[.]" *Id.* at 157; *see* Bromberg and Ribstein on Partnership, § 8.01[B], at 8-4 (2024-1 Supp.) ("the typical limited partner is an inactive and perhaps distant source of finance").

Similarly, Black's Law Dictionary then defined a "limited partnership" as a "partnership consisting of one or more general partners, jointly and severally responsible as ordinary partners, *and by whom the business is conducted*, and one or more special partners, contributing in cash payments a specific sum as capital to the common stock, and who are not liable for the debts of the partnership beyond the fund so contributed." Henry Campbell Black, A Law Dictionary, at 877 (2d ed. 1910) (emphasis added); *see also* Rapalje & Lawrence, A Dictionary of American and English Law, Vol. II, at 932 (1883) (same).

While this strict prohibition has been modified over the years, it remained in 1977 a defining feature of the limited partnership form that limited partners refrained from controlling or conducting the business. Beginning in 1916, for example, the Conference of Commissioners on Uniform State Laws promulgated a Uniform Limited Partnership Act ("ULPA"), with the intent that a limited partner be able to "invest his money in a business for a share in the profits * * * with the same sense of security from the possibility of unlimited liability as the subscribers to the shares of a corporation." *See* Lewis, 65 U. Penn. L. Rev. at 715, 723; *see also*, *e.g.*, *Lynn v. Cohen*, 359 F. Supp. 565, 567 (S.D.N.Y. 1973) (limited partnership more closely analogous to corporation than ordinary partnership); *Lichtyger v. Franchard Corp.*, 18 N.Y.2d 528, 536 (1966) ("limited partner is in 'a position analogous to that of a corporate shareholder,' an investor who likewise has limited liability and no voice in the operation of an enterprise").

Under the ULPA, a limited partner became liable as a general partner if he "[took] part in the control of the business." ULPA § 7 (1916). Cases applying that provision as adopted by various states held

limited partners liable as general partners where they exercised control over the affairs of the partnership. *See, e.g.*, *Delaney v. Fid. Lease Ltd.*, 526 S.W.2d 543, 545 (Tex. 1975) ("a limited partner who takes part in the control of the business subjects himself to personal liability as a general partner"); *Executive Hotel Assocs. v. Elm Hotel Corp.*, 245 N.Y.S.2d 929, 933 (Civ. Ct. 1964) (limited partner who "tak[es] an active part in [the partnership's] concerns * * * bring[s] on himself, the statutory consequences of a liability as a general partner") (quoting *Hogg v. Ellis*, 8 How. Pr. 473, 474 (N.Y. 1853)); *Donroy Ltd. v. United States*, 196 F. Supp. 54, 57 (N.D. Cal. 1961) ("under California law, a limited partner may not himself, control the conduct of the partnership business which must be left to the control of the general partners"); *Bergerson v. Life Ins. Corp. of Am.*, 170 F. Supp. 150, 159 (D. Utah 1958) (limited partners liable as general partners where they "participated in the management of the partnership"), *modified on other grounds*, 265 F.2d 227 (10th Cir. 1959); *Holzman v. Escamilla*, 86 Cal. App. 2d 858, 859-60 (1948) (affirming decree that limited partners "were general partners" and liable as such where they "took part in control of the business"). To be sure, other cases in that era held that

some participation by a limited partner did not rise to the level of control sufficient to destroy their limited liability.  (*See*, *e.g.*, RER Br. at 10-12 (collecting cases).)  The common thread of all of these cases, however, is that none of them allowed a state-law limited partner to exercise the degree of control and participation exercised by Sirius's individual partners.

A Revised Uniform Limited Partnership Act ("RULPA") was published in 1976, but not adopted by any state until 1979 (and then only by three).  *See* J. William Callison & Maureen A. Sullivan, *Partnership Law and Practice: General and Limited Partnerships* § 18:1 n.6 (2023-2024).  Although the RULPA further softened the restrictions on control by limited partners, and contained a list of "safe harbor" activities that were deemed not to constitute control of the partnership (*see* RULPA § 303(b)), it nonetheless "carrie[d] over the basic test from former Section 7."  RULPA § 303, Comment.  *See also* Michael K. Pierce, *Limited Partner Control and Liability under the Revised Uniform Limited Partnership Act*, 32 Sw. L.J. 1301, 1314-15 (1979).  Indeed, under the RULPA, a limited partner remained generally liable for the limited partnership's obligations "if the limited partner's

participation in the control of the business is * * * substantially the same as the exercise of the powers of a general partner." RULPA § 303(a). As one contemporary commentator on the RULPA observed:

> The limited partnership is a variation of the partnership. It is designed to allow passive investors in an enterprise to share profits without becoming responsible for losses or liabilities beyond the amount they invest in the business.

F. Hodge O'Neal, *Comments on Recent Developments in Limited Partnership Law*, 1978 Wash. U.L.Q. 669, 669 (1978). And Black's at that time continued to define a limited partnership as "a partnership consisting of one or more general partners, jointly and severally responsible as ordinary partners, *and by whom the business is conducted*, and one or more special partners, contributing in cash payments a specific sum as capital to the common stock, and who are not liable for the debts of the partnership beyond the fund so contributed." Black's Law Dictionary, at 1277 (Rev. 4th ed. 1968) (emphasis added); *see also* Bromberg & Ribstein on Partnership, § 9.01[A], at 9-5 (2021-3 Supp.) ("the two primary characteristics of a limited partnership [are] limited liability of limited partners only for their agreed contributions, and a hierarchical structure with

management centralized in one or more general partners and very little power or authority given to the limited partners").

Congress, of course, was not bound by the "control test" or any other aspect of a particular state's law, nor did it necessarily incorporate it, when it enacted the exemption from self-employment tax for "limited partners, as such." *See supra*, at 24-31. But this discussion shows that, at that time, it was commonly understood that a limited partner was more like a corporate shareholder—a passive investor— than an active participant, in a business enterprise.

In *Morgan*, the Supreme Court looked to the usual distinction between a general and specific power of appointment and concluded that Congress must have had that distinction in mind when it used the adjective "general" notwithstanding a specific contrary state-law definition. *Morgan*, 309 U.S. at 81. Likewise, here, the distinction usually made between a general partner and a limited partner, at least in 1977, lay *both* in the fact that a limited partner had limited liability *and* in the fact that a limited partner had little or no involvement in the running of the partnership's business, *i.e.*, was a passive investor. *See, e.g., Laney v. Commissioner*, 674 F.2d 342, 348 (5th Cir. 1982) (noting

"requirement" in Texas law that "limited partner be a passive actor");

*Lee v. Navarro Sav. Ass'n*, 597 F.2d 421, 427 n.6 (5th Cir. 1979) (limited

partner is "a passive investor who has no significant voice in the

management of the" business); *Goodman v. Epstein*, 582 F.2d 388, 406

n.51 (7th Cir. 1978) (under ULPA, "a limited partner may not take part

in the control of the business; he must remain a passive investor")

(quoting Jennings & Marsh, *Securities Regulation* 252 (1968)).

Despite increasing flexibility in some state statutes, federal courts

have continued to refer to limited partners as a passive investors in

various contexts. Recently, for example, this Court reaffirmed that

limited partnership interests generally are securities under federal law

because limited partners are passive investors with no active role in

management. *SEC v. Arcturus Corp.*, 928 F.3d 400, 410 (5th Cir. 2019)

("Without any significant powers, a limited partner is like 'a stockholder

in a corporation.'") (quoting *Youmans v. Simon*, 791 F.2d 341, 346 (5th

Cir. 1986)); *see* Bromberg & Ribstein on Partnership, § 8.01[B], at 8-5

(2024-1 Supp.) ("Because of limited partners' passivity, their

partnership interests almost always are 'securities' within federal and

state securities laws"); *cf. Steinhardt Group Inc. v. Citicorp*, 126 F.3d

144, 155 (3d Cir. 1997) (partnership interest *not* "security" despite

limited-partner state-law label where partner's "involvement [was]

significant enough to place it outside the role of a passive investor").[5]  It

---

[5] *See also*, *e.g.*, *Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1092 (10th Cir. 2020) (because "limited partners generally cannot 'exercise[ a] managerial role in the partnership's affairs,'" courts "usually treat them as 'passive investors'") (quoting *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 391 (D. Del. 2000)); *Life Care Centers of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*, 79 F.3d 496, 503 (6th Cir. 1996) ("[A] general partner acts much like the management of a corporation, while the involvement of the limited partners is comparable to the shareholders of a corporation. * * * [T]he role of the limited partners is very passive, in that it consists of an investment in the partnership with the expectation of obtaining a profitable return."); *Marin TV Servs. Partners, Ltd. v. FCC*, 993 F.2d 261, 262 (D.C. Cir. 1993) (discussing distinction between "passive limited partners" and active participation in the broadcaster's activities); *Marlin Broad. of Cent. Fla., Inc. v. FCC*, 952 F.2d 507, 511 (D.C. Cir. 1992) (same); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989) (limited partners "rely on the integrity of the general partner * * * to manage the business into which those passive investors have placed their funds"); *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1089 (D. Del. 1990) ("Inability to control the business of the Partnership combined with limited liability for the obligations incurred in the business of the Partnership are precisely the attributes of a limited partner."); *In re Adelphia Comms. Corp.*, 376 B.R. 87, 93 (Bankr. S.D.N.Y. 2007) ("a limited partner in a limited liability partnership is presumed to be a 'passive investor' and accordingly enjoys limited liability similar to that of a shareholder in a corporation").

only makes sense that Congress had that distinction in mind when it used the adjective "limited" in § 1402(a)(13).[6]

## 2. The statutory context confirms this reading

Moreover, the purpose and context of § 1402(a)(13) confirm that that is what Congress had in mind. "The definition of words in isolation * * * is not necessarily controlling in statutory construction. A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform

---

[6] Sirius asserts (Br. 30) that the Third Circuit's unreported opinion in *Hough v. Commissioner* 162 F.3d 1151, 82 A.F.T.R.2d 98-5263 (3d Cir. 1998) is "persuasive authority." But that case did not concern the question presented here, and, with no analysis, disposed of the self-employment tax issue in two sentences. Moreover, although the opinion is somewhat unclear, it appears that the taxpayer in *Hough* in fact was a passive investor in the limited partnership at issue. During the years at issue, he was "practicing law as a solo practitioner." *Hough*, 82-A.F.T.R.2d at 98-5264. The losses at issue came from "a limited partnership the Houghs had invested in by the name of Shelter Realty Partners III." *Id.* at 5265. And because they were investors in that limited partnership, they were subject to the § 1402(a)(13) exclusion from self-employment tax treatment of losses generated by that investment.

the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006); *accord Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020); *see Vitol, Inc. v. United States*, 30 F.4th 248, 249 (5th Cir. 2022) ("[t]ext cannot be divorced from context, and statutory meaning is not always common meaning").

Consideration of the statutory context and purpose here plainly favors the Tax Court's interpretation. Sirius admits (Br. 9; *see also* Br. 28) that "the 'limited partner' exception is an anti-abuse provision enacted to prevent limited partners from qualifying for Social Security." More specifically, it was meant to "plug up the limited partnership loophole" (MFA Br., Ex. A) that was created when self-employed individuals were first covered by Social Security in 1950 (*see supra*, at 21-24).

That is, as we explained above at pp. 18-19, Social Security primarily is designed to provide "for the decent support of elderly workmen who have ceased to labor." *Nierotko*, 327 U.S. at 640. And, at least since 1950, Congress has intended that the self-employed, just like those employed by others, should contribute "on the income [they] receive[ ] for [their] personal services." Packer & Leibowitz, 36 Calif. L.

Rev., at 67-68.  Doing so is "in keeping with the underlying purpose of the program, namely to provide protection against the loss of earning by reason of old age or death."  *Id.*  When Congress added coverage for the self-employed in 1950, it reaffirmed the principle that "[a] contributory system, in which *both contributions and benefits* are directly related to the individual's own productive efforts, prevents insecurity while preserving self-reliance and initiative."  H.R. Rep. 81-1300 at 2 (emphasis added).

But by including every partner's distributive share of ordinary income—without regard to the nature of the partner's status—in "net earnings from self-employment," Congress inadvertently created a "loophole" whereby limited partners "who merely invest[ed] a certain amount in a business * * * could obtain Social Security coverage without working."  (MFA Br., Ex. A.)  Qualifying for benefits through investment, and not work, was contrary to the underlying philosophy and purpose of the Social Security program and "ha[d] the potential for great inequity to those who contribute to the system through their work."  (*Id.*)  It was in that context, and for the specific purpose of addressing that problem, that Congress enacted § 1402(a)(13).

Congress meant only to exclude from coverage (and consequently from self-employment tax liability) those individuals who were limited partners as that term was traditionally used—that is, those who were passively deriving income from investment and not from working.

### 3. The legislative history confirms this interpretation

Legislative history further confirms that this was Congress's purpose in enacting § 1402(a)(13). *Cf. Morgan*, 309 U.S. at 81 (legislative history confirmed that Congress had "usual distinction" in mind). Although this Court disfavors "mining legislative history" (*see Thomas v. Reeves,* 961 F.3d 800, 817 n.45 (5th Cir. 2020) (*en banc*) (Willett, J., concurring)), in this case no digging is required. Congress told us explicitly why it enacted § 1402(a)(13): to prevent "investments in limited partnerships as a means for an investor to become insured for social security benefits." H.R. Rep. 95-702 (Part I) (1977) at 40-41. More specifically, Congress was concerned that "[i]n these situations the investor in the limited partnership performs no services for the partnership and the social security coverage which results is, in fact, based on income from an investment." *Id.* at 41. That outcome was "of course inconsistent with the basic principle of the social security

program that benefits are designed to partially replace lost earnings from work." *Id.* And so Congress enacted the exception for limited partnership interests "to exclude for coverage purposes certain earnings which are basically of an investment nature." H.R. Rep. 95-702 (Part 1), at 11.

When Congress exempted "limited partner[s], as such" from self-employment taxes, it had in mind passive "investors" who should not participate in a program designed to "partially replace lost earnings from work." H.R. Rep. 95-702 (Part I) at 41.[7] Whether they enjoyed

---

[7] That Congress understood the term "limited partner" to mean a passive investor is further confirmed by its passage of I.R.C. § 464 in 1976, the year before Congress enacted § 1402(a)(13). As originally enacted, § 464 limited the deduction of certain losses by "farming syndicates." *See* Tax Reform Act of 1976, P.L. 94-455, § 207, 90 Stat. 1520 (1976). A "farming syndicate" was defined to include, among other things, "a partnership * * * if more than 35 percent of the losses during any period are allocable to limited partners[.]" *Id.* § 207(a) (enacting I.R.C. § 464(c)(1)(B)). And the statute provided that an interest *not* "held by a limited partner" included, among other things, interests held by an individual "who has actively participated * * * in the management of any trade or business of farming[.]" *Id.* § 207(a) (enacting I.R.C. § 464(c)(2)). Discussing this limitation, the House Committee Report explained the desire to not allow these farming deductions by "a passive person similar to a limited partner[.]" H.R. Rep. No. 94-658, at 47 (1975); *see also id.* ("A person is similar to a limited partner if he does not actively participate in the operations or management of the farm."); *see also* S. Rep. No. 94-938 (Part 1), at 51-52 (discussing problem of

(continued…)

limited liability or were designated as a limited partner under any particular state's law was not any part of Congress's consideration. What mattered was that they were earning Social Security credits for income not derived from their labors. This case is the mirror image: Sirius's individual partners did not pay self-employment tax despite devoting substantial efforts laboring full-time in Sirius's business. Congress never contemplated or intended that such individuals be excluded from coverage.

### D. Sirius's and *amici*'s remaining arguments lack merit

#### 1. No negative inference can be drawn from I.R.C. § 1402(a)(10)

Sirius incorrectly argues (Br. 26) that, under the *expressio unius* canon, Congress's use of the phrase "no services" in § 1402(a)(10) means that Congress must have meant something different in § 1402(a)(13), which doesn't use that phrase.[8] Although "'a negative inference may be

_____

"participation (such as being limited partners in a nationwide syndicate) as a completely passive investment"); *id.* at 57 (discussing "passive investors" in "farming syndicates" structured as "limited partnerships").

[8] That section excludes from net earnings from self-employment retirement payments to retired partners if, among other things, "such

(continued…)

drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute'" (Br. 26 (quoting *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006))), § 1402(a)(10) and § 1402(a)(13) were *not* enacted as part of "the same statute." *See Rusello v. United States*, 464 U.S. 16, 23 (1983) (canon applies "where Congress includes particular language in one section of a statute but omits it in another section *of the same Act*") (emphasis added). The canon "is pretty weak when applied to acts of Congress enacted at wildly separated times." *Moreno Rios v. United States*, 256 F.2d 68, 71 (1st Cir. 1958). As Sirius acknowledges, § 1402(a)(10) was enacted in 1968, ten years before § 1402(a)(13). *See* Social Security Act of 1967, Pub. L. No. 90-248, § 118(a), 81 Stat. 821, 841 (1968). *Expressio unius* does not apply.

In any event, § 1402(a)(10) addressed a wholly different issue. Retirement payments are generally not taken into account for purposes of Social Security. *See* H.R. Rep. No. 90-544, at 35 (1967). But under the law at that time, *all* payments to *all* partners from a partnership

---

partner rendered no services with respect to any trade or business carried on by such partnership" during the year of receipt. I.R.C. § 1402(a)(10)(A).

engaged in a trade or business were subject to self-employment taxes, even if they were paid as retirement benefits, *i.e.*, to a partner who was "perform[ing] no services." *Id.* Because Congress felt that "partnership payments which are clearly retirement income should be excluded for all social security purposes[,]" it enacted § 1402(a)(10) so that "payments received by a retired partner from the partnership would be excluded under conditions which assure that the payments are bona fide retirement income." *Id.* It thus drew a distinction between payments to a partner on account of his services to the partnership versus payments to that partner after withdrawing from active service. *See* Webster's Third New International Dictionary, at 1939 (1968) ("retirement" means "withdrawal from office, active service, or business").

The premise of § 1402(a)(13), in contrast (*see supra,* at 21-23), was that individuals were obtaining Social Security credits on income that was "basically of an investment nature" (H.R. Rep. 95-702 (Part I), at 11) by purchasing limited partnership interests. It would make no sense for Congress to include a rule in § 1402(a)(13) that, to be a limited partner, the partner must perform "no" services. If that was the rule,

then investors in partnerships could obtain Social Security credits by simply performing some minor services, essentially "electing out" of § 1402(a)(13). That would defeat Congress's express purpose of excluding income of an investment nature.

### 2. The Tax Court's approach does not render the "guaranteed payments" clause surplusage

Sirius argues (Br. 8-9, 23-25) that the Tax Court's reading of the statute renders § 1402(a)(13)'s "guaranteed payments" clause surplusage because, "under that interpretation, any partner who provides services to the partnership would not qualify for the exception in the first place." Not so. It is not the government's position—and the Tax Court's interpretation of § 1402(a)(13) does not mean—that the provision of *any* services to a partnership renders the individual not a limited partner for purposes of § 1402(a)(13). The question is whether the individual—like the individual partners here (*see supra,* at 7-8)— earns their distributive share by acting in the manner of a self-employed person. Sirius's individual partners are at the far end of the spectrum, working full-time as service partners in a service partnership that derives all of its income from the provision of professional services. At the far other end of the spectrum are partners who perform no

services whatsoever.  In the middle are those individuals who perform *some* services for the partnership, but not so much so as to be functionally self-employed.  If those individuals receive no "guaranteed payments," then they do not include their distributive share in self-employment income.  But if they do receive "guaranteed payments" for those services (*see* I.R.C. § 707(c)), then they pay self-employment tax on those payments (to the extent that they are remuneration (*see* I.R.C. § 1402(a)(13)), and the remainder of their distributive-share income falls under the exception.  Thus, even under the Tax Court's functional analysis approach, the "guaranteed payments" clause is not surplusage; it still does work.

### 3. IRS and Social Security Administration publications do not contradict the government's position here

Sirius (Br. 12-18) and the *amici* (*e.g.*, MFA Br. 13) argue that IRS and SSA publications confirm their interpretation of "limited partner, as such" in § 1402(a)(13).  For example, Sirius notes that the instructions to Form 1065 for 1978 and the years at issue (Br. 13-15) defined a limited partner to mean a partner whose potential liability is limited to the amount he has contributed to the partnership, and

instructed that limited partners should treat as net earnings from self-employment only guaranteed payments for services rendered to the partnership.  And Sirius says the government is now "speaking out of both sides of its mouth."  (Br. 17 (quoting *Bittner v. United States*, 598 U.S. 85, 97 n.5 (2023).)

But nothing in those instructions is inconsistent with the government's litigating position here.  As demonstrated above at pp. 41-45, even under the various state laws then in effect, determining whether an individual state-law-denominated limited partner enjoyed limited liability could require an examination of the functional role that that individual played in the partnership.  An individual having pervasive involvement in the conduct and management of the business potentially would *not* have limited liability, but rather be liable as a general partner.  *See*, *e.g.*, *Mount Vernon Sav. & Loan Ass'n v. Partridge Assocs.*, 679 F. Supp. 522, 527 (D. Md. 1987) (under Maryland law, "a limited partner who disregards the limited partnership form to such an extent that he becomes substantially the same as a general partner has unlimited liability").  One not engaging in such pervasive activities would enjoy limited liability.  Similarly, a partner pervasively involved

in the conduct and management of the business would *not* be a "limited partner" for purposes of § 1402(a)(13).  And the Form 1065 Instructions simply refer to a limited partner who does not have that level of involvement, and thus *is* a limited partner for purposes of § 1402(a)(13).[9]

Sirius also claims (Br. 16-17) that a 2024 Treasury Department legislative proposal document declares that "because section 1402(a)(13) refers to 'limited partners,' the statute looks to 'the legal form' of ownership."  But that discussion was part of a proposal for an entirely different piece of legislation: expanding the "net investment income tax."  And even where it discussed § 1402(a)(13), that proposal noted: "Some partners who claim to be limited partner members may more accurately be described as general partners who would be subject to SECA."  *General Explanations of the Administration's Fiscal Year 2025*

---

[9] In any event, "IRS publications do not displace controlling statutes, regulations, and case law."  *Gerstenbluth v. Credit Suisse Secs. (USA) LLC*, 728 F.3d 139, 147 (2d Cir. 2013) (general advice in IRS publication that did not specifically instruct taxpayer to report settlement award of front and back pay as "wages" on Form 1040 was not inconsistent with IRS's litigating position that they were wages subject to FICA tax; and even if inconsistent it merely misstated the law).

*Revenue Proposals*, Dep't of the Treasury, at 73 (2024), available at https://home.treasury.gov/system/files/131/General-Explanations-FY2025.pdf (last visited Sep. 24, 2024). It explained that "[u]ncertainty surrounding the treatment of limited partners and LLC members who materially participate in their businesses undermines the IRS's ability to ensure payment of SECA tax and the NIIT." *Id.* at 74. To the extent that document has any relevance at all, it *confirms* the government's litigating position here: some who "claim" to be limited partners under state law are not limited partners for purposes of § 1402(a)(13) where they extensively participate in their business.

The Social Security Administration's regulations and sub-regulatory Program Operations Manual System ("POMS") also are not inconsistent with the government's position here. Sirius and the *amici* primarily rely (Br. 19, 25; MFA Br. 16-19) on 20 C.F.R. § 404.1080(b)(3), promulgated under 42 U.S.C § 411(a) (defining net earnings from self-employment for purposes of Social Security benefits). Section 411(a)(12), Title 42, contains a limited-partner exclusion that is substantially identical to I.R.C. § 1402(a)(13).

Sirius and the *amici* suggest that 20 C.F.R. § 404.1080(b)(3)'s definition of limited partner is at odds with the Tax Court's interpretation of that term in I.R.C. § 1402(a)(13). But the regulation itself references the control and services provided by the partner in determining whether the partner is a limited partner: "Generally, [a limited partner] will not have to perform services in the operation of, or participate in the control of, the business carried on by the partnership for the taxable year involved." 42 C.F.R. § 404.1080(b)(3) (second sentence). That is entirely consistent with the Tax Court's functional analysis under I.R.C. § 1402(a)(13).

And, as the Tax Court has explained, "[t]he concept of 'net earnings from self-employment' used in section 1402(a) provides the standard for determining not only liability for self-employment taxes but also eligibility for social security benefits." *Stevenson v. Commissioner*, T.C. Memo. 1989-357, 1989 WL 80841. Indeed, the SSA follows the Internal Revenue Code's definition of partnership-related items. *See* 42 U.S.C. § 411(d). And where the IRS collects and reports self-employment taxes to the SSA, the SSA credits those payments for purposes of calculating eligibility for benefits. *See* 42 U.S.C.

§ 405(c)(2)(A).  We are unaware of any case where the SSA denied

Social Security benefits on the ground that a partner who paid self-

employment taxes is nonetheless a limited partner not entitled to

benefits.  Even when a question of a limited partner's eligibility for

benefits arises, the SSA uses a "Partnership Questionnaire" (Form

7104. Soc. Sec. Rep. P 16007C), available at

https://www.ssa.gov/forms/ssa-7104.pdf (last visited Sep. 25, 2024),

which asks numerous questions similar to the Tax Court's functional

analysis, including:

- What services does each partner perform in connection with the business;

- How much time does each partner devote to the business; and,

- Who makes various decisions about specific operations.

The SSA's POMS provides no better support for Sirius's and the

*amici*'s argument.  First, the POMS, like IRS publications, "is not

binding law, because it is an unpublished policy statement[.]"

*Greenspan v. Shalala*, 38 F.2d 232, 239 (5th Cir. 1994).  Moreover, MFA

asserts (MFA Br. 19), without citation to the opinion, that POMS

"directly refutes the Tax Court's assertion in *Soroban* that the statutory

term 'limited partner' must mean a 'passive investor' who is a 'silent

-63-

partner' or 'inactive partner.'" But neither the word "silent" nor "inactive" appears anywhere in the Tax Court's opinion. *Soroban*, 2023 WL 8235164. Rather, the Tax Court held that "the limited partner exception does not apply to a partner who is limited in name only." *Id.*, 2023 WL 8235164, at *6.

### 4. Subsequent legislative proposals do not alter the plain meaning of § 1402(a)(13) when it was enacted

*Amicus* Managed Funds Association asserts (MFA Br. 21) that "various legislative and administrative proposals to revoke or amend the exclusion from SECA taxation for certain limited partner income" beginning in the 1990s "confirm the contemporaneous understanding that 'limited partner' in section 1402(a)(13) refers to partners with limited liability under state law." (*See also id.* at 21-29; *see also* RER Am. Br. at 16 (discussing 1994 regulatory proposals).) But those legislative proposals were *not* "contemporaneous" with the enactment of § 1402(a)(13); they were 20 to 30 years later. And the "view of a later Congress cannot control the interpretation of an earlier enacted statute." *O'gilvie v. United States*, 519 U.S. 79, 90 (1996); *see also South Carolina v. Regan*, 465 U.S. 367, 378 n.17 (1984) (quoting *Consumer*

*Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980)) ("views of a subsequent Congress * * * at best, 'form a hazardous basis for inferring the intent of an earlier one'").

Moreover, although "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight" (*Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380-81 (1969)), the history of subsequent *proposed* legislation which never passed is entitled to virtually no weight whatsoever. *See Pension Ben. Guar. Corp. v. LTC Corp.*, 496 U.S. 633, 650 (1990) (subsequent legislative history "is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law"). Indeed, "'several equally tenable inferences' may be drawn from [Congressional] inaction, 'including the inference that the existing legislation already incorporated the offered change.'" *Id.* (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962)). Here, for example, the 1993 proposal to replace "limited partner, as such" with "limited partner who does not materially participate in the activities of the partnership" (*see* MFA Br. at 22 (discussing Health Security Act, H.R. 3600, 103d Cong., § 7141 (1993))) may well have been nothing more

than an effort to clarify what § 1402(a)(13) meant all along.  In any event, whatever reasons later Congresses had for proposing, and not enacting, changes to § 1402(a)(13), they say nothing about what the Congress that enacted § 1402(a)(13) originally meant.

### 5.     The 1997 Congressional moratorium does not undermine the government's position

For similar reasons, the Congressional moratorium on certain proposed regulations (*see* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 935, 111 Stat. 788, 882 (1997)) does not inform the meaning of "limited partner" in § 1402(a)(13).  That temporary moratorium— enacted 20 years after § 1402(a)(13)—simply provided, without explanation, that no regulations "with respect to the definition of a limited partner under section 1402(a)(13)" could be issued or effective before July 1, 1998.  *Id.*  And although the Senate adopted a non-binding "Sense of the Senate" Resolution (*see* 143 Cong. Rec. S6694 (daily ed. Jun. 27, 1997)) stating that the proposed regulations "would effectively change the law administratively without congressional action," it also explained that the proposed regulations were an "attempt to address owners of" "certain types of entities, such as limited liability companies and limited liability partnerships" which "were not

widely used at the time that" § 1402(a)(13) was enacted. *Id.* Moreover,

the Senate's concern with those regulations twenty years after

§ 1402(a)(13) was enacted does not override the plain text of the statute

or the evidence of Congress's contemporaneous intent.

## CONCLUSION

The decisions of the Tax Court should be affirmed.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Paul A. Allulis

| | |
|---|---|
| ELLEN PAGE DELSOLE | (202) 514-8128 |
| PAUL A. ALLULIS | (202) 514-5880 |

  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

OCTOBER 11, 2024

# CERTIFICATE OF SERVICE

It is hereby certified on this 11th day of October, 2024, that this brief was filed with the Clerk of the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.

   /s/ Paul A. Allulis     

PAUL A. ALLULIS
*Attorney*

# CERTIFICATE OF COMPLIANCE

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X]   this document contains 12,985 words, **or**

    [ ]   this brief uses a monospaced typeface and contains _____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]   this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

    [ ]   this brief has been prepared in a monospaced typeface using _____ with _____.

3.  All required privacy redactions have been made in accordance with Local Rule 25.2.13.  The document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.  The electronic and paper submissions are identical as required by Local Rule 25.2.1.

(s)   /s/ Paul A. Allulis_____

Attorney for   Commissioner of Internal Revenue_

Dated:   October 11, 2024___