# In the United States Court of Appeals for the Fifth Circuit

---

Sirius Solutions, L.L.L.P., Sirius Solutions, GP, L.L.C., Tax Matters Partner,

*Petitioners-Appellants*,

v.

Commissioner of Internal Revenue,

*Respondent-Appellee.*

---

On Appeal from the United States Tax Court

Case Nos. 11587-20; 30118-21

---

## BRIEF FOR AMICUS CURIAE TAX LAW CENTER AT NYU LAW IN SUPPORT OF RESPONDENT-APPELLEE

---

Jonathan E. Taylor
Gupta Wessler LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com

Jessica Garland
Gupta Wessler LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0336

October 18, 2024                    *Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

As required by Federal Rule of Appellate Procedure 26.1, amicus curiae Tax Law Center at NYU Law states it is a non-profit organization. It has no parent corporation or publicly owned corporation that owns 10% or more of its stock.

## STATEMENT OF INTERESTED PARTIES

As required by Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to those already listed in the parties' briefs and the amicus briefs supporting the appellants, the following persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

***Amicus Curiae:*** Tax Law Center at NYU Law.

***Counsel for Amicus Curiae***: Jonathan E. Taylor and Jessica Garland of Gupta Wessler LLP.

*/s/ Jonathan E. Taylor*
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*jon@guptawessler.com*

# TABLE OF CONTENTS

Table of authorities ................................................................................ ii

Interest of amicus curiae and summary of argument ................................. 1

Argument ........................................................................................... 3

   I.    The text, structure, and history of section 1402(a)(13) show that its exemption for "limited partners" applies only to those who function like passive investors rather than self-employed people. .......... 3

       A.    In 1977, the term "limited partner" was commonly understood to refer to a passive investor. ..................................... 3

       B.    The statute's surrounding text and structure confirm that Congress sought to use the ordinary meaning of "limited partner" in 1977, which was a passive investor. ........................... 9

       C.    The statute's historical context further confirms that "limited partner" was meant as a proxy for "passive investor." .................................................................................15

   II.    This Court has long rejected attempts to apply state-law labels to the federal tax code "in the absence of statutory language" requiring such labels. ...........................................................17

Conclusion .........................................................................................24

i

# TABLE OF AUTHORITIES

## Cases

*Adams v. United States,*
218 F.3d 383 (5th Cir. 2000) ...................................................7

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ........................................................ 4

*Brown v. United States,*
890 F.2d 1329 (5th Cir. 1989) ......................................17, 19

*Burnet v. Harmel,*
287 U.S. 103 (1932) ................................... 2, 17, 18, 19

*C.M. Thibodaux Co. v. United States,*
915 F.2d 992 (5th Cir. 1990) ........................................ 18

*Carriage Square, Inc. v. Commissioner of Internal Revenue,*
69 T.C. 119 (1977) ...................................................7

*Estate of Meyer v. Commissioner,*
503 F.2d 556 (9th Cir. 1974) ........................................7

*Garnett v. Commissioner,*
132 T.C. 368 (2009) ...................................................5

*Goodman v. Epstein,*
582 F.2d 388 (7th Cir. 1978) ........................................ 8

*Laney v. Commissioner,*
674 F.2d 342 (5th Cir. 1982) ........................................ 8

*Loper Bright Enterprises v. Raimondo,*
144 S. Ct. 2244 (2024) ...............................................15

*Lyeth v. Hoey,*
305 U.S. 188 (1938) ...................................................17

*National Federation of Independent Business v. Sebelius,*
567 U.S. 519 (2012) ...................................................20

*New Prime Inc. v. Oliveira,*
   586 U.S. 105 (2019) ................................................................ 4, 7, 9, 19

*Obduskey v. McCarthy & Holthus LLP,*
   586 U.S. 466 (2019) ................................................................ 15

*PPL Corp. v. Commissioner,*
   569 U.S. 319 (2013) ................................................................ 20

*Redwing Carriers v. Tomlinson,*
   399 F.2d 652 (5th Cir. 1968) .................................................. 20

*Renkemeyer, Campbell & Weaver, LLP v. Commissioner,*
   136 T.C. 137 (2011) ................................................................ 7, 16

*Soroban Capital Partners LP v. Commissioner,*
   161 T.C. 12 (2023) .................................................................. 16

*Southwest Airlines Co. v. Saxon,*
   596 U.S. 450 (2022) ................................................................ 3, 4

*United States v. Craft,*
   535 U.S. 274 (2002) ................................................................ 18

*United States v. Kennedy Construction Company of NSB,*
   572 F.2d 492 (5th Cir. 1978) .................................................. 18

*United States v. Phellis,*
   257 U.S. 156 (1921) ................................................................ 20

*VanDerStok v. Garland,*
   86 F.4th 179 (5th Cir. 2023) ................................................... 4

*Weinert's Estate v. Commissioner,*
   294 F.2d 750 (5th Cir. 1961) .................................................. 20

## Statutes and regulations

Economic Recovery Tax Act of 1981,
   Pub. L. No. 97-34, § 503(a), 95 Stat. 172 (1981) ......................... 1

Omnibus Budget Reconciliation Act of 1993,
Pub. L. No. 103-66, 107 Stat. 312 (1993)................................................... 13

Revised Uniform Limited Partnership Act,
sec. 303(a), 6B U.L.A. 180 (1976) ............................................................5

Tax Reform Act of 1986,
Pub. L. No. 99-514, §§ 501(a), 801(a), 100 Stat. 2085 (1986) ...................13, 14

26 U.S.C. § 469.................................................................................... 14

26 U.S.C. § 706.................................................................................... 11

26 U.S.C. § 1256 .................................................................................. 13

26 U.S.C. § 1402....................................................................................*passim*

Del. Code. Ann. Tit. 6,
section 1707(a)-(b) (1974)...................................................................... 22

Nev. Rev. Stat. § 88.080 (1973)................................................................ 22

26 C.F.R. § 1.1256 ................................................................................ 13

Treas. Reg. § 1.1402(a)-2(g) (1974) ............................................................ 8

## Legislative history

H.R. Rep. No. 95-702, pt. 1 (1977)........................................................15, 16

Staff of Joint Commission on Taxation,
99th Cong., General Explanation of the Tax Reform Act of 1986
(Comm. Print 1987).............................................................................. 14

## Other authorities

Alan R. Bromberg,
*Crane & Bromberg on Partnership* (1968) ............................................5, 6, 10

ALI-ABA Course of Study,
   *Partnerships: UPA, ULPA, Securities, Taxation, and Bankruptcy, Substantive Partnership Law: Limited Partnerships* (Mar. 3, 1977) ..................................................................... 6

Bittker, McMahon, Zelenak & McGovern,
   Federal Income Taxation of Individuals § 1:16 (2024) ............................................. 20

Christine Hurt, D. Gordon Smith, Alan R. Bromberg, Larry E. Ribstein,
   3 Bromberg & Ribstein, *Partnership* (1988) ............................................................. 7

David W. Mayo & Rebecca C. Freeland,
   *Delimiting Limited Partners: Self-Employment Tax of Limited Partners*, 66 Tax Law. 391 (2013) ................................................................................................... 12, 21

F. Hodge O'Neal,
   *Comments on Recent Developments in Limited Partnership Law*, 1978 Wash. Univ. L. Q. 669 (1979) ................................................................................................. 22

Heather M. Field,
   *Checking in on Check the Box*, 42 Loy. L.A. L. Rev. 451 (2009) .................................. 14

Jacob Mertens,
   9 Mertens Law of Fed. Income Tax'n § 35:10 (2024) ................................................. 21

Jeffrey D. Sperling & Lawrence Lokken,
   *The Limited Partnership Tax Shelter: An Investment Vehicle Under Attack*, 29 Fla. L. Rev. 1 (1976) ......................................................................................................... 22

Karen C. Burke,
   *Exploiting the Medicare Tax Loophole*, 21 Fla. Tax Rev. 570 (2018) ............................ 6

McKee, Nelson & Whitmire,
   Federal Taxation of Partnerships & Partners (2024) ................................................. 20

New York State Bar Association Tax Section,
   Comments on Proposed Regulations Relating to Definition of Limited Partner for Self-Employment Tax Purposes 2, Report No. 896
   (Mar. 11, 1997) ...................................................................................................... 8, 16

NYSBA Tax Section,
  Comments on Proposed Regulations Relating to Self-Employment
  Tax Treatment of LLC Members (Oct. 5, 1995).................................................. 19

NYSBA Tax Section,
  Comments on the Application of Employment Taxes to Partners and on
  the Interaction of the Section 1401 Tax with the New Section 1411 38,
  Report No. 1247 (2011).............................................................................15

Rowley & Scott,
  *Rowley on Partnership including a Full Consideration of Joint Adventures,*
  *Limited Partnerships, Bankruptcy, and All Matters Collateral to the Law of*
  *Partnership* (1960)................................................................................... 6

Thomas E. Fritz,
  *Flowthrough Entities and the Self-Employment Tax: Is It Time for A*
  *Uniform Standard?*, 17 Va. Tax Rev. 811 (1998)........................................20

## INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT[1]

The Tax Law Center at NYU Law is a nonpartisan, nonprofit center dedicated to improving the integrity of the federal tax system. Its staff comprises tax law experts with experience in tax policymaking, administration, and litigation. The Center aims to protect and preserve tax revenues, advance equity through the tax system, and improve tax administration. Drawing on its expertise in partnership taxation, the Center submits this brief to offer its perspective on the meaning of 26 U.S.C. § 1402(a)(13) and the implications of this case for the federal tax system.

Section 1402(a)(13) exempts from the self-employment tax "the distributive share of any item of income or loss of a limited partner." The question in this appeal is what the term "limited partner" meant when Congress enacted this statute in 1977. As the government explains, and this brief expands upon, in 1977, "limited partner" was commonly understood to refer to a passive investor in a partnership, rather than someone who ran the partnership's business. By limiting the exemption to the distributive share of a "limited partner," then, Congress was seeking to exclude from the self-employment tax only passive investment income—not earnings from work.

The statute's surrounding text, structure, and historical context confirm this reading. Congress's focus throughout section 1402(a) was to draw a line between *active*

---

[1] This brief does not represent the views, if any, of NYU School of Law. No counsel for a party authored any part of this brief, no one other than amicus curiae paid for its preparation or submission, and all parties have consented to its filing.

income derived from labor (which is subject to the self-employment tax) and *passive* income *not* derived from labor (which is not subject to the tax). Congress drew this same line in section 1402(a)(13). It exempted a limited partner's passive investment income, but not any "guaranteed payments" that they might receive for discrete "services" provided to the partnership. This understanding of the statute, moreover, is the only one that makes sense given its historical context. Congress enacted section 1402(a)(13) to prevent passive partnership investments from generating Social Security benefits by triggering the self-employment tax, so it limited the tax to earnings from work. In doing so, it did not seek to create a new tax break for business owners who might one day be able to qualify as "limited partners" under their states' laws.

Yet that is the appellants' position in this case. Rather than apply the ordinary meaning of "limited partner" in 1977, they would have section 1402(a)(13) incorporate the evolving patchwork of state-law labels. But the Supreme Court and this Court have made clear that state labels do not apply to federal tax law unless Congress says so "by express language or necessary implication." *Burnet v. Harmel*, 287 U.S. 103, 110 (1932). It did neither here. No statutory text directs the application of state-law labels, and applying the common meaning of "limited partner" in 1977 is perfectly consistent with—indeed, better accords with—the text, context, and history. Allowing state-law labels to control here would be particularly improper because it would divorce the statute from its focus on functional results. This Court should reject that reading.

# ARGUMENT

**I.**  **The text, structure, and history of section 1402(a)(13) show that its exemption for "limited partners" applies only to those who function like passive investors rather than self-employed people.**

Section 1402(a)(13) of the tax code excludes from the self-employment tax "the distributive share of any item of income or loss of a limited partner, as such, other than guaranteed payments described in section 707(c) to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration for those services." 26 U.S.C. § 1402(a)(13). Congress's decision to confine this exemption to "a limited partner, as such," is best read to cover those who earn passive investment income from a limited partnership (that is, income from capital), as opposed to those who earn income from controlling and conducting the partnership's business (that is, income from labor). That's because, when this provision was enacted in 1977, the term "limited partner" was commonly understood to refer to passive investors, as distinct from general partners. And the statute's structure, context, and history confirm that Congress's use of "limited partner" in this provision was a proxy for passive investor.

**A.**  **In 1977, the term "limited partner" was commonly understood to refer to a passive investor.**

As always, the analysis "begin[s] with the text." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). But in parsing the text, courts do not ask how it might be understood by a "modern" reader, or how it might strike "lawyerly ears today." *New*

*Prime Inc. v. Oliveira*, 586 U.S. 105, 114 (2019). Instead, because "the meanings of statutes do not change with the times," *VanDerStok v. Garland*, 86 F.4th 179, 189 (5th Cir. 2023), courts must "interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment," *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654–55 (2020); *see also Saxon*, 596 U.S. at 455 (explaining that courts must give the words in a statute their "ordinary, contemporary, common meaning"). Courts are not authorized to "expand" a statute to "deviate[] from past definitions of the[] words to encompass items that were not originally understood to fall within [its] ambit." *VanDerStok*, 86 F.4th at 189. If "judges could freely invest old statutory terms with new meanings, [it] would risk amending legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands." *New Prime*, 586 U.S. at 113.

"[S]o, we orient ourselves to the time of the statute's adoption … and begin by examining the key statutory terms," *Bostock*, 590 U.S. at 655, focusing on what they "usually meant" at that time, *New Prime*, 586 U.S. at 114. And "to discern that ordinary meaning, those words must be read and interpreted in their context, not in isolation." *Saxon*, 596 U.S. at 455 (cleaned up). The relevant question here, then, is what "most people" in 1977 would have understood the key terms in section 1402(a)(13) to mean in their context. *New Prime*, 586 U.S. at 114. In 1977, when Congress excluded

from self-employment tax the income of "a limited partner, as such," those words would have been commonly understood to refer to passive investors in a partnership.

**1.** In 1977, the ordinary meaning of "limited partner" was a passive investor in a limited partnership. Although today it is common for members of limited liability companies (LLCs) and partners in limited liability partnerships (LLPs) to participate in partnership activity, that was not true in 1977. LLCs barely existed then—only Wyoming had an LLC statute at the time—and LLPs did not exist until 1991. *See Garnett v. Comm'r.*, 132 T.C. 368, 374 (2009). Before LLCs and LLPs, it was not common practice for limited partners to participate actively in the partnership's business.

To the contrary, limited partners were generally constrained in what services they could provide beyond their role as a passive investor. Even if they were not categorically "barred from performing services for some compensation other than a share of profits, … doing so raise[d] the question whether [they were] taking part in control" of the business. Alan R. Bromberg, *Crane & Bromberg on Partnership* 148, n.44 (1968). And in 1977, any limited partner that could be viewed as "taking part in control" of the partnership would have risked losing limited-partner status and thus protection from liability. Revised Unif. Ltd. P'ship Act, sec. 303(a), 6B U.L.A. 180 (1976).

In fact, in 1977, state law—which establishes and governs partnerships and other business organizations—generally prevented limited partners from

participating in a partnership's business. As the American Bar Association explained in 1977, a limited partner was "a partner in all respects like any other partner, except that to obtain the privilege of a limitation on his liability, he has conformed to the statutory requirements in respect to . . . refraining from participation in the conduct of the business." ALI-ABA Course of Study, *Partnerships: UPA, ULPA, Securities, Taxation, and Bankruptcy, Substantive Partnership Law: Limited Partnerships* (Mar. 3, 1977); *see also* Karen C. Burke, *Exploiting the Medicare Tax Loophol*e, 21 Fla. Tax Rev. 570, 578 (2018) (recognizing that, in 1977, "state-law restrictions [] generally prevented a limited partner from actively participating in management of a partnership's business"). *Black's Law Dictionary* reflected this same understanding, distinguishing between "general partners" of a limited partnership, "by whom the business is conducted," and "special partners," who simply contribute capital investments and "are not liable for the debts of the partnership beyond the fund[s] so contributed." *Limited Partnership*, *Black's Law Dictionary* (4th ed. 1968). A well-known treatise on partnership law, published in 1968, similarly explained that "the limited partner plays a negligible role in the partnership[:] He may not take part in control; his contributions may not be services." Bromberg, *supra*, at 148; *see also* Rowley & Scott, *Rowley on Partnership including a Full Consideration of Joint Adventures, Limited Partnerships, Bankruptcy, and All Matters Collateral to the Law of Partnership* § 53.0 (1960) (describing limited partners as

capital investors akin to corporate shareholders because the "management and control of the business . . . are restricted to the general partners").

That basic understanding of limited partnership continued for many years. Over a decade after section 1402(a)(13) was enacted, a "leading treatise on partnership law," *Adams v. United States*, 218 F.3d 383, 389 (5th Cir. 2000), continued to recognize that "the interest of a limited partner in a limited partnership is generally akin to that of a passive investor," Christine Hurt, D. Gordon Smith, Alan R. Bromberg, Larry E. Ribstein, 3 Bromberg & Ribstein, *Partnership*, § 12.01(a) (1988).

"What the dictionaries [and treatises] suggest, legal authorities confirm." *New Prime*, 586 U.S. at 115. The same year that section 1402(a)(13) was enacted, a Tax Court judge recognized that, "[i]n the usual limited partnership, the limited partners contribute substantial sums needed to earn the income and the general partner performs services." *Carriage Square, Inc. v. Comm'r of Internal Revenue*, 69 T.C. 119, 133 (1977) (Goffe, J., concurring); *see also Renkemeyer, Campbell & Weaver, LLP v. Comm'r*, 136 T.C. 137, 150 (2011) (recognizing that, in 1977, "individuals who merely invested in a partnership and who were not actively participating in the partnership's business operations [] was the archetype of limited partners"). Circuit courts at the time also understood that, generally speaking, a limited partner "may not actively participate in running the business[.]" *Est. of Meyer v. Comm'r*, 503 F.2d 556, 558 (9th Cir. 1974). Because "a limited partner may not take part in the control of the business[,]   he

must remain a passive investor." *Goodman v. Epstein*, 582 F.2d 388, 407 n.51 (7th Cir. 1978). This Court made the same observation in describing Texas law in 1982, noting the general "requirement that a limited partner be a passive actor." *Laney v. Comm'r*, 674 F.2d 342, 348 (5th Cir. 1982).

The Executive Branch, too, shared this understanding of the term at the time. In regulatory guidance issued in 1963 and amended in 1974, the Treasury Department and the Internal Revenue Service used the terms "a limited or inactive partner" interchangeably, underscoring that limited partners were generally understood to be inactive in the partnership's business in 1977. Treas. Reg. § 1.1402(a)-2(g) (1974).

In sum, section 1402(a)(13) was "enacted at a time when state partnership laws required limited partners to be almost entirely passive investors," at least as a general matter. N.Y. State Bar Ass'n ("NYSBA") Tax Section, Comments on Proposed Regulations Relating to Definition of Limited Partner for Self-Employment Tax Purposes 2, Report No. 896 (Mar. 11, 1997). As a result, "it seems fairly clear that when Congress originally referred to 'limited or inactive' partners, it believed that these two adjectives were simply different ways of expressing the same thought." *Id.*

**2.** Nor did Congress just use the term "limited partner." To ensure that the exemption served its purpose of excluding investment income from the self-employment tax, Congress specified that the exemption wouldn't apply to the entire distributive share of any person that qualified as a "limited partner"; rather, it would

apply only to the extent that a partner acts as a "limited partner"—which is to say, as a passive investor. The statute states that the exemption applies to a "limited partner, as such[.]" The words "as such" clarify that, to qualify for the exemption, a limited partner must generally receive their "distributive share" of the partnership's income, 26 U.S.C. § 1402(a)(13), "in the manner" of a limited partner as of 1977, *see Oxford English Dictionary on Historical Principles* (1973) (defining "as such" as "in the manner that"). In other words, the statute looks to whether someone receives their distributive share as a limited partner under the ordinary understanding of that term in 1977—not to whether the subsequently enacted law of a particular state happens to label them as a limited partner under an evolving conception of what that term means. *Contra* Appellants' Br. 21–23 (arguing that the phrase "as such" was included solely to cover someone whom state law considers to be both a general partner and limited partner).

**B.    The statute's surrounding text and structure confirm that Congress sought to use the ordinary meaning of "limited partner" in 1977, which was a passive investor.**

If the phrase "limited partner, as such" didn't make sufficiently clear that section 1402(a)(13)'s exemption applies only to those who function as passive investors and do not run the partnership's business, "[m]ore confirmation yet comes from … [the rest of] the statutory text." *New Prime*, 586 U.S. at 116.

**1.** The second half of section 1402(a)(13) reinforces that the exemption applies only to income limited partners earn in their capacity as passive investors. As noted, limited partners' ability to perform services for the partnership was tightly constrained in 1977 to ensure that they were not functioning as general partners. In certain limited cases, however, they were permitted to "perform[] services for some compensation other than a share of profits." Bromberg, Crane & Bromberg on Partnership, at 148. So, to focus the limited-partner exemption on investment income, Congress expressly clarified that it would apply only to their "distributive share," earned in their capacity as a limited partner, and would not extend to any "guaranteed payments" paid to them for "services actually rendered[.]" 26 U.S.C. § 1402(a)(13). The income from those services, unlike investment income, is income from work, and hence properly outside the scope of the exception. Thus, even if the performance of discrete services might not have been enough to transform a limited partner into a general partner in 1977, Congress made certain that the compensation received for performing such services would still be classified as self-employment income. In this way, the carve-out for "guaranteed payments" also reflects that section 1402(a)(13) does not require an "all-or-nothing" approach to the level of activity required for limited-partner treatment. Congress could have required limited

partners to provide "no services" to the partnership to qualify for the exception, as it did section 1402(a)(10), but it sensibly chose not to. *See* U.S. Br. 53–56.[2]

**2.** The broader structure of section 1402(a) similarly confirms this reading of subsection (a)(13). Section 1402(a) first provides the general rule that income subject to self-employment tax includes income from "any trade or business carried on" by an individual, as well as the "distributive share … from any trade or business carried on by a partnership of which [the individual] is a member." Subsections (a)(1) through (a)(17) then modify this general rule with a list of adjustments and exclusions. Several of these modifications (including the one at issue here) simply identify income types excluded from the self-employment tax even if they would otherwise satisfy section 1402(a)'s general rule. These include rental income from leased real estate (section 1402(a)(1)); dividends and interest (section 1402(a)(2)); gains from certain dispositions of capital assets and other non-inventory property (section 1402(a)(3)); and retirement payments to non-service partners (section 1402(a)(10)).

---

[2] In addition, the use of the phrase "other than" indicates that Congress may have been concerned that, but for the carve-out, guaranteed payments could have been treated as part of a limited partner's "distributive share" of partnership income and therefore exempt from self-employment tax. 26 U.S.C. § 1402(a)(13). Guaranteed payments are essentially treated as a partner's "distributive share" of partnership income for certain tax purposes, *see, e.g.*, 26 U.S.C. § 706(a), and so Congress sensibly sought to clarify that they would *not* be treated as a partner's distributive share for this purpose.

Notably, all these exclusions identify either investment income or income that is not otherwise from the provision of services. Rental income, dividends, and interest are all excluded—but only when not earned in a "trade or business[.]" 26 U.S.C. § 1402(a)(1), (2). Gain from property dispositions is excluded if the property is held for investment—but not if it is "stock in trade" or inventory. *Id.* § 1402(a)(3). Retirement payments are likewise excluded—but only if they are not derived from current services. *See* U.S. Br. 55. And, by the same token, a limited partner's passive investment income is excluded—but not the compensation that they receive for services they performed.

**3.** Other related provisions in the tax code support this reading. The use of "limited partner" in section 1402(a)(13) as a proxy for "passive investor" was not an isolated example, but rather was Congress's common practice at the time. After enacting section 1402(a)(13), Congress continued to use the term "limited partner" elsewhere in the tax code "as a proxy for being a passive investor in a business—or just a passive investor[.]" David W. Mayo & Rebecca C. Freeland, *Delimiting Limited Partners: Self-Employment Tax of Limited Partners*, 66 Tax Law. 391, 425 (2013); *see also id.*

at 414–19 (analyzing a wide range of tax provisions that use the term "limited partner," including sections 448, 469, 1256, and 1258).[3]

Take, for example, section 1256's mark-to-market rules, which were enacted in 1981. Section 1256(e)(3) applies what is known as mark-to-market accounting to certain transactions entered into by "syndicates," and defines "syndicate" to mean "any partnership or other entity (other than a corporation which is not an S corporation) if more than 35 percent of the losses of such entity during the taxable year are allocable to limited partners or limited entrepreneurs[.]" 26 U.S.C. § 1256(e)(3)(B). The statute then excludes from "limited partner" status anyone "who actively participates . . . in the management" of the partnership. *Id.* § 1256(e)(3)(C)(i). An example in the regulations clarifies that someone who "provides all of the goods and services" in an entity's business is not a limited partner, whereas someone that "does not participate in [the entity]'s business" is a limited partner. 26 C.F.R. § 1.1256(e)-2(c). Section 1256 and its accompanying rules therefore reflect Congress's understanding that a partner's "limited" status is determined by reference to their level of activity in the underlying business.

---

[3] Section 1256 was first enacted in 1981, Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, § 503(a), 95 Stat. 172, 327–30 (1981); sections 469 and 448 were first enacted in 1986, Tax Reform Act of 1986, Pub. L. No. 99-514, §§ 501(a), 801(a), 100 Stat. 2085, 2233–41, 2345–48; and section 1258 was first enacted in 1993, Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312, 463–65 (1993).

A few years later, in 1986, Congress again applied this understanding to section 469's rules on passive activity losses. Tax Reform Act of 1986, Pub. L. 99-514, §§ 501(a), 801(a), 100 Stat. 2085, 2345 (1986). Like section 1402, section 469 generally predates the steep rise in popularity of LLCs and other non-corporate entities and the significant evolution in state partnership law that followed. *See* Heather M. Field, *Checking in on Check the Box*, 42 Loy. L.A. L. Rev. 451, 462 (2009). Section 469 presumes a "limited partner" does not "materially participate[]" in the business except as provided in regulations. 26 U.S.C. § 469(h)(2). Congress explained that this presumption is appropriate because, "[i]n general, under relevant State laws, a limited partnership interest is characterized by limited liability, and in order to maintain limited liability status, a limited partner, as such, cannot be active in the partnership's business." Staff of Joint Comm. on Tax'n, 99th Cong., General Explanation of the Tax Reform Act of 1986 (Comm. Print 1987). Thus, a decade after enacting section 1402, Congress continued to write statutes based on its understanding that limited partners did not participate significantly in partnership business.[4]

_____

[4] The subsequent enactment of the Net Investment Income Tax (NIIT) in 2011 further underscores Congress' understanding that, for the self-employment tax, "limited partner" means a passive investor. NIIT was framed as a tax imposed on "income that is exempt from the Section 1401 tax [for self-employment income] because it is not sufficiently linked to a trade or business to be 'earned income' (i.e., is passive income)." NYSBA Tax Section, Comments on the Application of Employment Taxes to Partners and on the Interaction of the Section 1401 Tax with

### C. The statute's historical context further confirms that "limited partner" was meant as a proxy for "passive investor."

This reading is further reinforced by the statute's historical context. *See, e.g.,* *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024) (invoking the history of the APA to "underscore[]" its "plain meaning"); *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 477 (2019). As the government explains at length (at 18–24), Congress enacted section 1402(a)(13) to prevent passive partnership investments from generating Social Security benefits by triggering the self-employment tax. To that end, Congress sought to exclude investment income from the self-employment tax base, and thus from generating Social Security benefits, by limiting the tax to "earnings from work." *See* H.R. Rep. No. 95-702, pt. I, at 40–41 (1977). That basic distinction—between investment income and earnings from work—runs through the exception, explaining both the distinction between a "limited partner" and a general partner (as understood at the time) and the carve-out for "guaranteed payments" received as "remuneration" for services. 26 U.S.C. § 1402(a)(13).

In the run-up to the statute's enactment, Congress had "become increasingly concerned about situations in which certain business organizations solicit[ed]

---

the New Section 1411 38, Report No. 1247 (2011) (hereinafter "NYSBA 2011"). Although earned income from the provision of services was already subject to self-employment tax, passive income is exempt from such taxes and thus could be taxed under the NIIT. *Id.*

investments in limited partnerships as a means for an investor to become insured for social security benefits." H.R. Rep. No. 95-702, pt. 1, at 40–41 (1977). Because the income fell within the self-employment tax net, the investments generated Social Security benefits. "In these situations, the investor in the limited partnership performs no services for the partnership and the social security coverage which results is, in fact, based on income from an investment." *Id.* at 41. These arrangements were thus inconsistent with the Social Security program's overall design to "partially replace lost earnings from work." *Id.*

So, in keeping with section 1402(a)'s other exclusions, Congress added subsection (a)(13) to ensure that the self-employment tax would apply just to "earnings from work"—and therefore that Social Security would benefit workers and not mere investors. NYSBA 2011 at 8; *see Renkemeyer*, 136 T.C. at 150. "Essentially, it was enacted to exclude earnings that are of an investment nature" from the self-employment tax. *Soroban Capital Partners LP v. Comm'r*, 161 T.C. 12, at *4 (2023) (citing H.R. Rep. No. 95-702, pt. 1, at 11). By using the term "limited partner" and combining it with a carve-out for guaranteed payments, Congress was drawing a line between investment income and "earnings from work." *Id.*

## II. This Court has long rejected attempts to apply state-law labels to the federal tax code "in the absence of statutory language" requiring such labels.

The appellants assert that Congress intended the meaning of "limited partner" in section 1402(a)(13) to depend on the ever-changing patchwork of state-law labels. But this Court has long recognized that, "in the absence of statutory language to the contrary, the Supreme Court has advised that a provision of the Internal Revenue Code should be read 'so as to give a uniform application to a nationwide scheme of taxation.'" *Brown v. United States*, 890 F.2d 1329, 1337 (5th Cir. 1989) (quoting *Burnet*, 287 U.S. at 110). There is no reason, based on the statutory text or otherwise, to diverge from that general command here. To the contrary, applying state-law labels to the term "limited partner" in section 1402(a)(13) would undermine the purpose of the provision and the uniformity of federal taxation.

For more than 90 years, the Supreme Court has been clear that in interpreting "a statute enacted by Congress in the exercise of its plenary power under the constitution, to tax income, … [i]t is the will of Congress which controls." *Burnet*, 287 U.S. at 110. This means that, "in the absence of language evidencing a different purpose, [the statute] is to be interpreted so as to give a uniform application to a nationwide scheme of taxation. State law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law." *Id.*; *see also Lyeth v. Hoey*, 305 U.S. 188, 194 (1938).

That clear instruction is not only longstanding; it also makes good sense. Congress's customary choice not to adopt state-law labels allows the federal government to attach federal tax consequences separate from the choices that individual states have made about distinctions between entity forms. *See United States v. Craft*, 535 U.S. 274, 278–79 (2002) ("State law determines only which sticks are in a person's bundle [of property]. Whether those sticks qualify as 'property' for purposes of the federal tax lien statute is a question of federal law."); *C.M. Thibodaux Co. v. United States*, 915 F.2d 992, 996 (5th Cir. 1990) (rejecting attempt to apply state law labels to federal tax laws and explaining that the fact that "state law characterizes a right to receive income as a property right [] is not controlling on the question of which party should pay taxes on the income").[5] The appellants' contrary "approach to the application of the Internal Revenue Code" that applies state-law labels to federal tax provisions "would yield as many results as there are local jurisdictions." *United States v. Kennedy Constr. Co. of NSB*, 572 F.2d 492, 495 (5th Cir. 1978).

Section 1402(a)(13) "neither says nor implies that the determination of '[limited partner]' is to be controlled by state law." *Burnet*, 287 U.S. at 110. State laws in 1977, to be sure, did constrict the kinds of income that a limited partner could earn from a partnership, and it was because of these state-law restrictions that income earned by

---

[5] Accordingly, a state-law limited partnership and its state-law limited partners will have the rights that state law gives them, including limited liability if applicable. But the federal tax liability that results from these rights is determined by federal law.

a limited partner in 1977 was generally investment income. But just because what a "limited partner" "usually meant" in 1977 was a *result* of state law does not mean that Congress, by using that term, intended to direct taxpayers to the ever-changing laws of 50 different states to determine how to apply the provision going forward. *See New Prime*, 586 U.S. at 114 (explaining that statutory terms mean what they "usually meant" "at the time of [their] adoption"). There is no reference to state law in the statute, let alone any "express language" directing its application. *Burnet*, 287 U.S. at 110.

Nor is there any "necessary implication" to apply a state-law label to "limited partner." Although Congress did not codify a general definition of "limited partner," there was a commonly understood meaning of that term in 1977, and the statutory structure, context, and history all support applying that meaning. "Under the *Harmel* presumption," then, "section [1402(a)(13)] of the Code can be fairly read to require a uniform federal standard by which the Commissioner may deem" that a limited partner's earnings are exempted from the self-employment tax. *Brown*, 890 F.2d at 1337.[6]

---

[6] Appellants' amici rely on Treasury's proposed 1994 regulation to argue that section 1402(a)(13) is tied to state-law definitions. *See* Real Estate Round Table Br. 16; Managed Funds Ass'n Br. 24–26. That reliance is misplaced. After an outpouring of comments raising concerns with the approach of tying the meaning of "limited partner" to state law—because state law is subject to change—Treasury withdrew the proposed regulations. *See, e.g.,*

Reading federal tax law to apply in a uniform manner here is also consistent with a fundamental rule of construction that dates to "[w]hen today's federal income tax was still in its swaddling clothes," Bittker, McMahon, Zelenak & McGovern, Federal Income Taxation of Individuals § 1:16 (2024). The principle that permeates tax law is that, in interpreting and applying tax concepts, courts generally must look to "substance" rather than "form." *United States v. Phellis*, 257 U.S. 156, 168 (1921). This principle is fundamental to the interpretation of tax concepts in the Constitution and the tax code, as well as in analysis of specific taxpayer situations. *See, e.g.*, *id.*; *National Fed. of Ind. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012); *Redwing Carriers v. Tomlinson*, 399 F.2d 652, 659 (5th Cir. 1968). It can also be described as looking to "economic realities" rather than labels or "legal abstractions." U.S. Br. 31–33 (quoting *PPL Corp. v. Comm'r*, 569 U.S. 319, 335 (2013)). The government is correct that this "cornerstone of sound taxation," *Weinert's Estate v. Comm'r*, 294 F.2d 750, 755 (5th Cir. 1961), is fundamental, including in the partnership context, McKee, Nelson & Whitmire, Federal Taxation

NYSBA Tax Section, Comments on Proposed Regulations Relating to Self-Employment Tax Treatment of LLC Members (Oct. 5, 1995); Thomas E. Fritz, *Flowthrough Entities and the Self-Employment Tax: Is It Time for A Uniform Standard?*, 17 Va. Tax Rev. 811, 840 (1998). A proposed regulation that was withdrawn without ever becoming final does not provide a persuasive explanation of what a statute enacted two decades earlier means. *See Est. of Wallace v. Comm'r*, 95 T.C. 525, 547 (1990), *aff'd*, 965 F.2d 1038 (11th Cir. 1992) ("Proposed regulations are not entitled to judicial deference and generally carry no more weight than a position advanced by respondent."). It certainly changes neither the "express language" nor the "necessary implication" of what Congress wrote into law in 1977. *Burnet*, 287 U.S. at 110.

of Partnerships & Partners ¶ 1.06(1) (2024) ("It is axiomatic that the substance, rather than the form, of a transaction determines its tax consequences."); 9 Mertens Law of Fed. Income Tax'n § 35:10 (2024) (same), and precludes reading section 1402(a)(13) to privilege state-law labels over the substantive roles of partners in these entities.

Section 1402(a)(13)'s purpose further underlines why a uniform, functionalist definition is important here, rather than one that turns on state-law labels. Congress passed section 1402(a)(13) to achieve a uniform result: to exclude investment income from Social Security and, correspondingly, the self-employment tax base. But while the patchwork of state laws could provide a general understanding of "limited partner" as functionally a passive investor in 1977, state laws varied on exactly how much a state-law limited partner could participate in a partnership's business while retaining limited liability. *See* Mayo & Freeland, *Delimiting Limited Partners*, *supra*, at 397–98 (providing that New York and Delaware had different limitations on the participation of a limited partner in a partnership). Partners who stepped over the line (as defined by their state's laws) into the role of a general partner would lose their limited liability to various extents. *See id.* at 394–95. Thus, tying the rule for limited-partner status under section 1402(a)(13) to specific state-law labels would have, even in 1977, resulted in partners who behaved the exact same way in different states being subject to different federal-income-tax consequences. This would have created a disuniform application of section 1402(a)(13) and is inconsistent with Congress's goals.

Not only did the specifics of state laws vary in 1977, but Congress would have been aware that state limited-partnership rules were in flux and that it was unclear how states would come to define "limited partner" in the future. Some states had made changes to laws regarding limited-partner liability in the few years prior to section 1402(a)(13)'s enactment. *See, e.g.*, Nev. Rev. Stat. § 88.080 (1973); Del. Code. Ann. Tit. 6, section 1707(a)-(b) (1974). The Revised Uniform Limited Partnership Act of 1976 had been proposed, but no states had yet adopted it. F. Hodge O'Neal, *Comments on Recent Developments in Limited Partnership Law*, 1978 Wash. Univ. L. Q. 669, 670–71 (1979). So, Congress could not have been sure that the changing specifics of state-law definitions would align with federal goals. *See, e.g.*, Jeffrey D. Sperling & Lawrence Lokken, *The Limited Partnership Tax Shelter: An Investment Vehicle Under Attack*, 29 Fla. L. Rev. 1, 2 (1976) (observing in 1976 that, in "recent years," the IRS had been increasingly unwilling to find that a state-law limited partnership would be treated as a partnership for federal-tax purposes, showing a divergence between treatment for state and federal income-tax purposes).

It would therefore have made little sense for Congress to have designed section 1402(a)(13) to continue to change in unknown ways. The provision's meaning would become divorced, as state law evolved, from its focus on functional results. Among other things, it would make paying self-employment taxes almost entirely elective for many businesses. If, as the appellants suggest, *current* state-law labels apply, any

individual who runs a business and simply organizes the business as a state-law limited partnership—whether that be a law firm, consulting firm, or accounting firm—would be exempted from paying self-employment taxes for potentially all the income earned through such work. Indeed, prior to *Soroban*, partnership businesses were routinely advised to use state-law limited partnerships rather than LLCs to "elect out" of paying self-employment tax on partnership income other than guaranteed payments without any other changes in federal tax treatment. The appellants' approach would bless this formalistic circumvention of the tax laws.[7]

Strict adherence to current state-law labels is likely to create other unintended and incorrect results. For example, it would mean that an individual sole proprietor could potentially be exempt from self-employment tax in a manner entirely at odds with section 1402(a) by qualifying as a state-law limited partner without even being a "partner" in a "partnership" for federal income tax purposes. As the government explains (at 29), "an individual's status vis-à-vis a particular entity, so far as it matters for federal tax purposes, also is inherently a question of federal—not state—law." Because the statute's text, structure, history, and context all support reading "limited partner" to refer to partners who function as passive investors rather than as partners

_____

[7] Conversely, if state-law labels control, a member of an LLC would not qualify as a "limited partner"—and so would be treated differently than their counterpart in a state-law limited partnership—no matter how similar their activities within their respective businesses.

who control the business and perform work on its behalf, there is no basis on which to adopt the appellants' reading of the statute. Doing so would undermine the statute's purpose, create an inexplicable loophole in federal tax law, and contravene precedent from this Court and the Supreme Court.

## CONCLUSION

This Court should affirm the Tax Court's decisions below.

Respectfully submitted,

/s/ Jonathan E. Taylor
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0336

October 18, 2024

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 5,951 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this reply brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor

**CERTIFICATE OF SERVICE**

I certify that on October 18, 2024, a true and correct copy of the foregoing brief was filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all CM/ECF participants, resulting in service upon all counsel of record.

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor